(No. 32881.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EUGENE PHILLIP CHILDRESS, Plaintiff in Error.

*Opinion filed November 18, 1953.*

JOSEPH E. CLAYTON, JR., of Chicago, for plaintiff in error.

432

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and ROBERT MCDONNELL, all of Chicago, of counsel,) for the People.

Mr. JUSTICE MAXWELL delivered the opinion of the court:

Eugene Phillip Childress prosecutes this writ of error from a judgment and sentence of the criminal court of Cook County. Tried upon an indictment for murder of one Alexander Plank, Childress, hereinafter referred to as defendant, was found guilty by a jury and his punishment was fixed at death. Motions for a new trial and in arrest of judgment were overruled and defendant was sentenced in accordance with the jury's verdict.

Six witnesses testified for the prosecution. A brother of Plank established the identification of the body. Mrs. Delores Lamb testified that on the night in question she was standing in a doorway with a friend and noticed three men struggling in front of 3109 South State Street, which was about three doors from where she was standing. She stated that the defendant was one of these three men. Upon seeing the struggle she ran into Al's Tavern located at 3101 South State Street. Two of the men were colored and the one man was white. The white man seemed to be fighting the others off. She was in the tavern approximately five minutes and when she came out she saw a man lying between the safety island and the sidewalk with his throat cut. When in the tavern she yelled that there was a fight outside. She did not see either of the two men who had been struggling with Plank when she came from the tavern. She had been standing in the doorway at 3103 South State Street for approximately 15 or 20 minutes before the struggle took place at approximately 12:30 in the morning. She further testified that she appeared at

the coroner's inquest and there stated under oath that she would be able to identify Jesse Douglas as being one of the two colored men and that she did not know Phillip Childress. At the trial she explained that she did not know Phillip Childress by name. She then stated that she did not see the scuffle when it started but that the men were fighting when she came to the door; that there is an archway and a doorway where she had been standing. She and her companion were standing back of the archway and when she went out of the doorway she stated that she noticed the scuffle, which was to the south of the witness and her companion. She did not recall how defendant was dressed but stated that she looked long enough to recognize him. She testified generally to the lighting conditions at the time and further stated that the scuffle or struggle took place approximately 20 to 25 feet away from her. She paid no attention as to whether any other persons were around. She presumed the defendant was fighting with his fists.

James Johns testified that he was at 3111 South State Street at the time in question, sitting on the steps of an old bank building. He stated Plank came up and talked to him for about five minutes when the other men, walking in a southerly direction, came to this location. He did not know their names but had seen them around there. The witness thought Douglas asked Plank if he wanted to see a girl and Plank replied in the negative. The defendant backed up against the wall about two feet from the witness and told Plank to come over there. Plank did so and stood between defendant and Douglas. A conversation ensued, which the witness did not hear. Douglas then caught Plank in the back of the collar and started going through his right pocket. The defendant then caught him in the front, went into his left pocket, and then began the struggle. A beer bottle which Plank held in his hand fell to the ground and broke as soon as the struggle began. Plank slipped

and fell to his knees. Defendant struck him about four or five times, and when Plank got up trying to run, defendant then struck at him twice but missed. The struggle lasted from five to fifteen minutes and took place directly in front of the witness. This witness at no time saw anything in the defendant's hand or in the hands of Douglas. Plank ran north on State Street to the stop light, went into the street and there fell. The witness walked in front of the radio shop and saw blood in front of Plank's body. He did not see what happened to the other two men after Plank began to run.

Officer Charles Johns stated he arrived on the scene pursuant to a call. There was a crowd gathered around the streetcar safety island where the body of deceased was lying in the street face down. He saw the wounds on the body of deceased and the trouser pockets of deceased pulled inside out.

Detective James McGrath stated he arrested defendant in the city of St. Louis, Missouri, July 5, 1951, and while riding on the train with defendant from St. Louis to Chicago he had a conversation with him. In this conversation defendant stated that he had been known also under the name of Chick Lee James; that he knew he was being returned to Chicago in connection with a stabbing; that he and Douglas attempted to strong arm the deceased and that he struck the deceased with his fists several times. McGrath stated he was present in the State's Attorney's office when defendant was asked certain questions and made certain answers. This question and answer statement as transcribed was identified as People's exhibit 3 and consisted of 15 pages. McGrath stated that it was a correct transcription.

Joseph Tournier stated he was a shorthand reporter for the State's Attorney's office at the time defendant was questioned by the assistant State's Attorney. His testi-

mony in substance was given for the purpose of establishing the correctness of People's exhibit 3.

Over objection of defendant, People's exhibit 3 was admitted into evidence and read to the jury. It is with this statement that we are now chiefly concerned. The first few pages consist of preliminary background history of defendant. Coming to the occasion in question, the defendant then narrates that he was with Jesse Douglas around midnight, that he and Douglas saw Plank when they walked across Thirty-first Street at State Street; that Plank talked about a girl; that defendant said he would go across the street, walked to the corner of Thirty-first and State but saw no one. Defendant again stated he would go across the street and that Douglas was talking to Plank and asked him to wait a while as he started to cross the street. Defendant stated he then figured Douglas contemplated robbing Plank; that Plank said if defendant didn't hurry he would have to go. Then followed some conversation about money and a girl after which Plank got nervous, stated that he had been rolled before and then Douglas grabbed him by the arm and pulled him back. Plank then swung and struck defendant, whereupon defendant hit Plank four or five times, or maybe five, six, or seven times; that he hit him on the chin and in the stomach but not on the back or neck. That Douglas grabbed deceased from the back and then fell to the ground fighting and rolling. That the defendant pulled Douglas once when he rolled on top and that they were rolling down towards the street and that a lot of people gathered around and defendant walked away. That Douglas did not walk away before defendant but that he followed defendant and that later defendant and Douglas walked on to Wabash. Defendant stated that he told Douglas he was going to his girl's home when he noticed blood on Douglas's sleeve; that he inquired if Douglas had cut the man and Douglas

stated that he had done so. Defendant then asked Douglas why and Douglas stated that he "was just high." Defendant stated he saw no knife on Douglas and that defendant had no knife. That he got no money from Plank and did not see Plank's condition when he left him, at which time Plank was walking across the street. He saw no blood on deceased, saw him fighting on the ground but did not see him fall afterwards. He only saw him staggering across the street. He stated that he heard the next day that the police were picking everyone up who had been around the corner and that they were looking for him and Jesse; that someone saw them with the fellow (Plank) and that he died last night. Defendant then stated he obtained money from his brother and caught a bus for Kansas City, Missouri, where he stayed for a month and used his own name; that later he had been in Chicago one night in October and learned he was really in trouble. He stated that he remembered getting away from the sheriff who tried to pick him up in southern Illinois; and that he was later arrested June 21, 1951, at Maplewood, Missouri, giving them the name of Chick James and later told them his name was Childress.

In the last part of the statement, defendant was asked the following questions and gave the answers shown:

"Q. You know that Douglas, in his statement he made to us, as I read to you, said you were the one that did the stabbing, you know that, don't you?

A. Yes, sir.

Q. He says you hit him about ten or twelve times with the knife, you know that, don't you? Is that the truth?

A. No sir, that is not the truth.

Q. You know Douglas said both you and Childress and Plank were wrestling on the street, is that the truth?

A. No sir, I never wrestled with him.

Q. You know that Douglas said you started wrestling with the deceased when you couldn't get your hand in his

pocket and that is when the deceased hit you, you remember that?

A. No, sir.

Q. Then, did you know Douglas says you hit him and knocked him back, then you were hitting him with the knife; Douglas said that the knife was a ———— looked like a long one, and that you had the knife, do you remember that, and that you had the knife, do you remember that, and that Jesse Douglas didn't have a knife, do you see that?

A. Yes.

Q. And that after the deceased, Alexander Plank, was knocked out on the Street that is when he saw this knife in your hand, Jesse Douglas saw it in your hand?

A. He didn't see a knife in my hand, I never had a knife.

Q. Then he says the reason it was the first time he saw a knife in your hand, the way it was all this time Jesse thought you, that is Childress, was hitting Plank with his fist, he was hitting with a knife, and he didn't see the knife in your hand until it was about all over. Then Jesse says he saw you hitting Plank with the knife, and he says, I don't know how many times you had hit him with the knife, do you remember that, but he claims you hit him at least, you hit Plank at least twelve to fifteen times, is that true?

A. No, sir.

Q. How many times did you hit him?

A. I hit him four or five, five or six times with my fist; I didn't have a knife.

Q. How old are you?

A. Nineteen."

Upon defendant's objection being made to the admission of this statement, the court stated to defendant's counsel that if the presence of Douglas was requested he would be produced to testify. When defense counsel stated that

he did not care to put Douglas on the stand the court over-ruled the objection. No offer was made by the State to produce Douglas to testify. Although the indictment charged Douglas and Childress jointly with murder, the record does not reveal the disposition of the charge against Douglas. His plea of guilty prior to trial is referred to in the motion for new trial.

The coroner, by stipulation, then described the wounds causing the death.

The defendant did not testify, and only two witnesses testified in his defense. Mrs. Frankie Davis testified that on the evening of August 11, 1950, she was working as a waitress in a restaurant and tavern in the vicinity of the occurrence; that she had known Plank prior to said date, and saw him on the evening in question; that Plank had been drinking and was still at the tavern when she left work about eight o'clock. Leroy Vital, a law student, testified merely as to the lighting conditions at the place of the occurrence.

It is now urged by defendant that the lower court committed error in the admission of Peoples' exhibit 3 into evidence. Further assignments of error deal' with the admission of other evidence, the giving of certain instructions, prejudicial argument by the State's Attorney, limiting defense counsel's cross-examination and competency of defendant's trial counsel. In view of the holding of this court we deem it unnecessary to pass upon the latter assignments. We note that one of the instructions given commented upon the defendant's testimony. Such an instruction would clearly be erroneous where the defendant relies upon his constitutional rights and refuses to testify, as was done in this case. However, the error was not preserved for the reason that the abstract does not set forth all of the instructions given by the court, and neither record nor abstract shows which instructions were given on behalf

of the People and which instructions were given on behalf of the defendant.

The complained-of statement incorporates accusations by a codefendant against the defendant on trial. There is no showing that the person making the accusations was present at the time defendant made his replies. It is further to be noted that the statement is neither an admission nor a confession on the part of the defendant. The trial court apparently took the position that no harm could be done to defendant in admitting the statement in evidence since the defendant denied his guilt and denied the accusations of the codefendant. The State contends that this exculpatory statement is harmless error and did not prejudice the defendant. In view of the fact that apparent error was committed it becomes our duty to examine the authorities in this State for a determination of its nature.

In *People* v. *Schallman,* 273 Ill. 564, we declared that the principle upon which statements or accusations made in the presence of one accused of crime are admitted in evidence against him is that his silence when he might, and naturally would, deny the accusations of guilt if they were untrue, is regarded as an acquiescence of their truth and an implied admission of guilt. Where the incriminating statements or accusations are denied *in toto* by the accused, there can be no implied admission of his guilt, and such statements are wholly inadmissible against him.

In *People* v. *Buckminster,* 274 Ill. 435, counsel for the State argued that even though the evidence was improperly admitted, the guilt of plaintiff in error was so clearly shown by other evidence properly in the record that the admission of the confession, when an instruction of the court strictly limited its effect, was harmless. We did not agree with the State's contention and held that "The admission of improper testimony that would have a tendency to warp or prejudice the minds of the jury can

hardly be considered harmless on this record. This confession was highly prejudicial to plaintiff in error. It would be impossible to decide with any certainty as to whether it would or would not unconsciously affect the jury as to their verdict. If from the legal evidence admitted they had any doubt as to the guilt of plaintiff in error, the jury would not find it easy, or perhaps possible, to remove from their minds the impression produced by this confession."

In *People* v. *Evertson,* 316 Ill. 397, a codefendant made a confession of his participation in the crime charged and implicated plaintiff in error. As in the present case, the codefendant was not present on trial and did not testify, yet other witnesses detailed to the jury the story told them by the codefendant. The statement of that codefendant was not made in the presence of the defendant. At page 398 of the *Evertson* opinion this court declared, "that it was error to receive this evidence is so elementary that citation of authority is unnecessary."

In *People* v. *Nitti,* 312 Ill. 73, we held that statements of a defendant are never admissible where the accused unequivocally denies their truth, citing *People* v. *Harrison,* 261 Ill. 517.

In *People* v. *Rupert,* 316 Ill. 38, we declared, " 'no man can confess for anyone but himself.' (*People* v. *Anderson,* 239 Ill. 168.)" We held in the *Rupert case* that it was error to admit into evidence alleged confessions of each defendant against the other. It appeared to this court in the *Rupert case* that it was so manifest that the defendants did not have a fair trial that we did not consider the fact that they went on the witness stand and testified on their own behalf as off-setting the errors committed against them.

In *People* v. *Barragan,* 337 Ill. 531, in a separate trial of one accused of robbery, one of the robbers who pleaded guilty was called to testify. He stated that he and not the defendant committed the crime. We there held it was not

competent, even for the purpose of impeachment, for a police officer to testify that he took a statement from the witness out of the presence of defendant in which the witness stated that defendant participated in the crime, as it was hearsay and immaterial as against the defendant on trial and highly prejudicial to such defendant.

In *People* v. *Vehon*, 340 Ill. 511, at page 518, we held that a confession or admission against interest by a co-conspirator or codefendant is clearly inadmissible against a defendant who was not present when such confession or admission was made.

In *People* v. *Patris*, 360 Ill. 596, it appeared that defendant denied any complicity in the crime charged and asked for a severance. Other defendants had made oral confessions to authorities admitting guilt and implicating the defendant. The application was denied as to severance from one defendant. A police officer gave testimony over objection as to codefendant's confession implicating defendant. We declared that admissions of one charged with a crime, made out of the presence of a codefendant, are not competent as against the codefendant, and a severance should be ordered unless the State's Attorney declares such testimony will not be offered unless all reference to the defendant is eliminated. We held the denial of the petition for severance, under the circumstances shown in the *Patris* record, an abuse of discretion which undoubtedly contributed largely to the conviction of defendant. We expressed no opinion upon the guilt or innocence of that defendant but declared that the constitution guarantees to every person accused of crime, whether innocent or guilty, a fair and impartial trial and no person should be condemned who has been deprived, over his objection, of such a trial.

In *People* v. *Willson*, 401 Ill. 68, we held that when a charge is made by a defendant that another individual did the killing and such other person would answer with

a countercharge, no admission, expressed or implied, could be attributed to either from such a conversation, because the very fact they are charging each other separately excludes implication of an admission in any respect.

In *People* v. *LaCoco,* 406 Ill. 303, after citing several cases, we held the rule to be that accusations of guilt when made in the presence of a defendant and denied by him are not admissible in evidence. Likewise, the confession of a codefendant, made in the presence of an accused and denied by him, is incompetent against the accused.

In *People* v. *Bennett,* 413 Ill. 601, an accusatory statement was read to the defendant in the presence of many authorities and defendant remained silent. Although the person who signed the written accusation was later in the presence of defendant when it was read to him, we declared "The law is well settled that statements or declarations of a party or witness in corroboration of his theory of the case, whether oral or written, are as a general rule inadmissible in evidence except where they are part of the *res gestae* or made in the presence of defendant." Since that statement was no part of the *res gestae* and was made out of defendant's presence we held it to be pure hearsay and prejudicial error to admit it in evidence. The court further declared that it deprived the defendant of his right to a fair trial.

In view of the foregoing decisions of this court it would be idle to contend that the error committed below was harmless. If, as contended by the State, there was sufficient other evidence to convict defendant then it is difficult to understand what purpose motivated its use other than to arouse the passion and prejudice of the jury. People's exhibit 3 is laden with prejudicial qualities. It purports to give to the jury an impression that the accusations of a codefendant are true, authentic and voluntary, whereas in fact none of these conditions may have existed. Even if the accusatory portion of the statement were

authentic, insofar as being authored by the codefendant, there is still the question as what the entire statement of this non-present witness was. In addition, defendant here was denied the right of confrontation of his accuser. The State here attempts to allow accusatory statements to be given to a jury without the right of cross-examination to test the credibility of the person making the charges, showing his interest or showing the circumstances under which they were made. Defendant's right to a fair trial was prejudiced by such irregular procedure.

Surely the courts will not countenance that to be accomplished by indirection which they will not permit directly. Admitting into evidence a statement of a person made out of the presence of the defendant when that person is not under oath and not subject to cross-examination, particularly under the circumstances of this case, is in violation of fundamental justice. If the accusations had been made by the codefendant in the presence of defendant they would clearly be inadmissible under the prevailing rule for the reason that they were denied by defendant. The State could have easily produced the codefendant to testify in open court, yet evidently desired not to do so. Even a guilty person has a right to an orderly and unprejudiced trial under our system of jurisprudence. The importance of this principle is emphasized in homicide cases where the jury must fix the penalty. Passion and prejudice created by erroneous conduct during a trial will undoubtedly be reflected in the verdict of a jury.

For the foregoing reasons the judgment and sentence of the criminal court of Cook County is reversed and the cause remanded for a new trial.

*Reversed and remanded.*