THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEON BLACKWELL, Defendant-Appellant.

First District (1st Division)    No. 78-161

Opinion filed September 10, 1979.

Burton A. Brown, Ltd., of Chicago (J. Chris Goodman, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Linda Dale Woloshin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Leon Blackwell, was convicted by a jury of burglary and the murder of Agnes Bookham. Defendant received concurrent sentences of 6½ to 20 years for burglary and 60 to 70 years for murder. Defendant appeals from both convictions and also from the sentence for murder.

Harris Orange, a witness for the State, testified that he was defendant's accomplice in both crimes. Orange stated that at 9 p.m. on June 4, 1975, he went to the apartment of William Gandy, defendant's uncle, in order to buy some preludin (speed) from Gandy. When he arrived, defendant, whom he had known for six months, was already there. Charlita Ponce, another friend, arrived shortly afterwards. Orange was unable to buy any preludin from Gandy because he had no money, so he, Charlita and defendant left Gandy's apartment together around midnight. This testimony was corroborated by William Gandy, who, in addition, stated he had also refused to sell any preludin to defendant or Charlita because they, too, had no money.

Orange further testified that after he, Charlita and defendant left Gandy's apartment, they first went to Charlita's boyfriend's apartment to get some money, but were unsuccessful. At Charlita's suggestion, they next went to "Al's" apartment to get some money and pills, but Al was not at home. Charlita at this time said they could get some money from an old lady who lived on Winthrop Avenue. They then proceeded to 4933 Winthrop, the home of Agnes Bookham, the victim.

Charlita and defendant waited in front of the house while Orange went to get his burglary tools, including a crowbar, screwdriver and pliers, which were stored under a porch at Gandy's. When Orange returned, he, defendant and Charlita each put on a pair of workmen's gloves that Orange had in his burglary kit. After this, they moved to the side of the house. Defendant searched for the telephone cable, while Orange removed the screen on a basement window and laid it against the side of the house. Orange then entered the basement through the window. Defendant and Charlita went around to the front of the house.

The door at the top of the basement stairs was locked, but Orange forced it open and entered the first floor. He went through the living room and opened the front door, allowing Charlita and defendant to enter. Orange told defendant he had just seen an elderly woman walking down the hallway toward the back of the house. Defendant then went in that direction, while Orange started taking out his burglary tools. Defendant soon returned to the living room, holding Agnes Bookham. Defendant had a hand over her mouth and was pinning one of her arms behind her.

Orange began searching the living room for a safe and tore a hole in the wall over the mantelpiece with a crowbar. After searching for the safe for about 15 minutes, Orange started back toward the kitchen and saw

defendant on top of Agnes Bookham "going up and down on her." When Orange reached the kitchen, he searched around for a while and then took some lunchmeat from the icebox. While he was eating the lunchmeat, he looked into the living room and saw defendant and Charlita with Agnes Bookham. Charlita had placed her head between the victim's legs, and the victim was saying, "Please leave me alone."

Orange soon returned to the living room and took a drink from a bottle of "Early Times" that was there. After that, he went into the bathroom. When he came out, he saw Charlita tying the victim's hands with an extension cord. Orange searched around the house for a while and then re-entered the living room and had another drink. He noticed that the victim was tied up on the floor. Orange at this time went out on the porch for a minute to get some air. When he came back inside, he told defendant and Charlita he was ready to go. Defendant tied the victim's ankles together with a scarf and then tied her ankles to her hands. Charlita subsequently put tape on the victim's face, while defendant searched for pills. After Charlita finished taping the victim, they left the house. Charlita gave Orange $30 and he returned to Gandy's by himself.

Officer Frank Gieb was the first policeman to discover the victim's body. He testified that late in the afternoon on June 5, 1975, he entered the victim's home through the back door and saw that food and dishes were scattered on the kitchen floor. As he walked toward the front of the house, he noticed that the buffet and dresser drawers had been pulled out and that clothing and other items were strewn around.

In the living room, Officer Gieb saw the victim lying on the floor. Her ankles and hands had been tied together, and the upper part of her face and head were covered with masking tape. The lower part of her body was at that time covered with a bedspread, but when it was later removed, he saw that the victim's skirt had been pulled over her waist and that her underwear had been pulled to the side, exposing her vaginal area.

Officer Gieb also went outside to examine the premises and noticed that a screen had been removed from one of the basement windows and placed alongside the house. In addition, he saw that the telephone wires leading into the house had been cut.

Officers Esmagde Christia and Jerry Richards were two of several other policemen who went to the victim's home on June 5, 1975. Officer Christia testified that damage had been done to the door leading from the first floor to the basement. The outside moulding of the door jamb had been ripped from the wall. Also, a rough-edged hole, approximately one by two feet, had been made in the inner portion of the fireplace and plaster and debris were on the floor below it.

Officer Richards testified that he attempted to take fingerprints from various articles in the house. On a number of these items, prints suitable

for comparison were present. On other objects, prints were taken but they were not comparable to those of Orange, Charlita or defendant.

Dr. Yuksel Konakciju was the pathologist who conducted an autopsy. He testified that there were bruises in the victim's vaginal area and a small abrasion in the vaginal orifice. There were also two other small abrasions between the vagina and the anal orifice. The victim's lungs contained fluid and were congested. Dr. Konakciju determined that death resulted from a combination of asphyxia, due to gagging, and severe arterio-sclerosis. The asphyxia had created a lack of oxygen in the victim's blood, which caused the damage to her heart.

Defendant's first and second contentions are that the testimony of Harris Orange and William Gandy was insufficient to establish that defendant was guilty beyond a reasonable doubt of either burglary or murder. Defendant argues that Orange's testimony was unbelievable because Orange admitted that (1) in return for his testimony the State agreed to drop the murder charge pending against him and accept a plea of guilty to burglary, for which crime the State would recommend a sentence of 2 to 6 years; (2) during 1974 and 1975 he was a narcotics addict, although he denied injecting any drugs on the night of the crime; (3) he had previously been convicted of theft, possession of preludin, and of the attempt to gain drugs by the use of a false prescription; (4) in his previous conviction for possession of narcotics he had falsely told the trial judge that he was a heroin addict in an attempt to avoid being sent to the penitentiary.

According to defendant, William Gandy's testimony was also unbe-lievable because Gandy admitted that (1) he had been selling narcotics and had taken preludin once or twice a day during June of 1975, although he denied taking preludin on the day of the crime; (2) he had previously been convicted of theft.

■■■ These facts concerning Orange and Gandy were all brought to the attention of the jury during cross-examination and closing argument. Also, the jury was instructed that the testimony of an accomplice is subject to suspicion and should be acted upon with caution. Presumably the jury took all this into consideration, but still chose to believe Orange and Gandy. This is entitled to considerable weight on review. (See *People v. Hudson* (1970), 46 Ill. 2d 177, 263 N.E.2d 473.) Moreover, a conviction may be based on the uncorroborated testimony of an accomplice "even when subject to infirmities of promises of leniency" (*People v. Parks* (1977), 49 Ill. App. 3d 65, 68, 363 N.E.2d 93), and a jury's determination that an accomplice's testimony was credible should not be disturbed by a reviewing court unless the evidence was so improbable as to raise a rea-sonable doubt of guilt. (*People v. Harland* (1977), 49 Ill. App. 3d 1024,

365 N.E.2d 713.) In our opinion, the testimony of Orange and Gandy was sufficient to justify defendant's convictions for burglary and murder.

■■ Defendant's third contention is that he should have been allowed to ask Orange whether he knew the prosecutors might be able to help him with a pending charge of violating probation on his prior narcotics conviction. The prosecutor objected to this question, stating there had been no negotiations with Orange concerning the probation charge. This objection was sustained and defense counsel then withdrew the question. By withdrawing the question, defendant cannot now maintain that the trial judge erred in sustaining the objection. Furthermore, after the objection was sustained, defense counsel was nevertheless able to repeat the question and elicit an answer from Orange:

> "Q. Mr. Orange, you are aware, are you not, that if you were brought forth on a violation of probation, it would be prosecuted by Assistant State's Attorneys of Cook County, are you aware of that?
>
> A. I'm aware of that.
>
> Q. And you know that the persons with whom you made this deal are also Assistant State's Attorneys of Cook County, isn't that correct?
>
> A. Yes.
>
> Q. I take it, sir, you would expect them to help you, if you do a good job today, wouldn't you, Mr. Orange?
>
> A. I didn't know nothing about no probation.
>
> Q. Would you expect them to help you, Mr. Orange?
>
> A. Yes, I would expect them."

■■ A defendant cannot complain that a trial judge committed reversible error by denying him the opportunity to ask a question of a State witness when, in fact, the witness was subsequently allowed to answer the question. See *People v. Paez* (1977), 45 Ill. App. 3d 349, 359 N.E.2d 1083; *People v. Attaway* (1976), 41 Ill. App. 3d 837, 354 N.E.2d 448.

■■ Defendant's fourth contention is that, on redirect examination of Orange, the State should not have been permitted to introduce a prior confession Orange had made concerning the murder of Agnes Bookham. Defendant argues that the admission of the statement was contrary to the rule cited in *People v. Childress* (1953), 1 Ill. 2d 431, 115 N.E.2d 794, that a confession by a co-conspirator is inadmissible as evidence of guilt against a defendant who was not present when the confession was made. The record shows, however, that the prior statement by Orange was actually admitted to counteract an attempt by defense counsel on cross-examination to discredit Orange's credibility by showing that he had a motive to testify falsely due to a promise of leniency. When a witness is

charged with fabricating his testimony, or with a motive for testifying falsely, " 'proof that he gave a similar account of the transaction when the motive did not exist * * * is admissible.' " (*People v. Powell* (1973), 53 Ill. 2d 465, 475, 292 N.E.2d 409.) Orange's prior confession was made on August 30, 1975, approximately one year before he was promised leniency, and it was substantially similar to his direct testimony concerning the manner in which Agnes Bookham was murdered. The trial court did not err in allowing this statement into evidence.

Defendant's fifth contention is that the trial court erred in sustaining objection to the following recross-examination of Harris Orange because it prevented defendant from showing that Orange had caused his attorney to file a motion to suppress his prior confession as the product of physical and mental abuse:

"Q. Was the statement which you made in police custody which you had indicated was made August 30, 1975, was that statement a voluntary statement on your part, is that—was it given of your own free will, or was it forced out of you, so to speak?

A. It was given of my own free will.

Q. Did you ever attempt to challenge the voluntariness of that statement in a courtroom?

A. Yes, my lawyer did.

Q. Was that after conversations with—had between you and your lawyer?"

Objection by the assistant State's attorney was sustained.

■■ The decision to limit the scope of cross and recross-examination is within the discretion of the trial court, and such a decision will not be reversible error unless it involved a clear abuse of discretion resulting in manifest prejudice to the defendant. (See *People v. Wilson* (1975), 32 Ill. App. 3d 842, 336 N.E.2d 92.) In this instance, the record shows that the trial judge felt that evidence that the motion to suppress had been filed was not probative of whether Orange's confession was credible. In view of the fact that motions to suppress are frequently filed as a matter of course, and are often denied, we find no abuse of discretion in the trial judge's decision. Furthermore, the record shows that defendant was allowed fairly wide latitude in cross-examining Orange concerning the events surrounding his arrest, interrogation, confession and treatment by the police. For example, Orange testified on cross-examination that when he was interrogated, he was struck on the shoulder and kicked in the leg by a policeman. Orange also testified, however, that his confession was not the result of this physical abuse, but was given of his own free will. This information, which the jury presumably considered, was certainly more relevant concerning whether Orange's confession was believable

than the fact that his attorney filed a motion to suppress it. No prejudice was suffered by defendant as a result of the trial court's action.

■■ ■ Defendant's sixth contention is that the trial court committed reversible error by excluding as impeachment evidence certain prior criminal convictions of Gandy. Evidence of these convictions was excluded under the rule in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, that evidence of a conviction for impeachment purposes is not admissible if a period of more than 10 years has elapsed since the date of conviction or the release of the witness from confinement, whichever is later. Defendant argues, however, that the holding in *Montgomery* is applicable only to defendants. This argument has no merit. The *Montgomery* rule applies to all witnesses at a trial, whether it is civil or criminal. (*People v. Hughes* (1979), 72 Ill. App. 3d 604, 391 N.E.2d 27.) Evidence of these prior convictions, which predated the ten-year limit of *Montgomery*, was properly excluded.

Defendant's seventh contention is that the trial court improperly refused to give the following non-Illinois Pattern Jury Instruction offered by defendant on the reliability of the accomplice testimony of Orange:

> "Where a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion, and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case.
>
> When a witness testifies who has hopes for a reward in exchange for his testimony, such testimony should not be accepted unless it carries with it an absolute conviction of its truth."

Illinois Pattern Jury Instruction, Criminal, No. 3.17 (2d ed. 1968) (hereinafter IPI Criminal) deals with the weight to be given accomplice testimony and reads:

> "An accomplice witness is one who testifies that he was involved in the commission of a crime with the defendant. The testimony of an accomplice witness is subject to suspicion, and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

The dissenting opinion in *People v. Parks* (1976), 65 Ill. 2d 132, 139, 357 N.E.2d 487, criticizes IPI Criminal No. 3.17 in the use of the term "accomplice witness" because "it tends to tell the jurors that the defendant participated in the crime."

■■ When an IPI criminal instruction does not accurately state the law with respect to a particular subject, the trial court may, in its discretion, give a non-IPI instruction dealing with the subject. (Ill. Rev. Stat. 1977, ch. 110A, par. 451(a).) The propriety of the use of "accomplice" in IPI

Criminal No. 3.17 is not before us, however. The trial court in fact gave a non-IPI instruction tendered by the State concerning a witness' testimony which did not use the word "accomplice." The instruction which the trial court gave read:

"Where a witness says he was involved in a commission of a crime with the defendant, that testimony of that witness is subject to suspicion, and should be considered by you with caution. It must be carefully examined in the light of other evidence in this case.

You have a right to take into consideration whether or not a witness has been promised consideration in relation to his punishment for his testimony."

■■ The first paragraph of this instruction is virtually identical to the first paragraph of defendant's instruction and, except for its deletion of the word "accomplice," was also substantially the same as IPI Criminal No. 3.17. It is true that the second paragraph of the instruction given differed somewhat from the second paragraph of the instruction tendered by defendant. However, the instruction which the trial court gave did inform the jury that the witness' testimony was "subject to suspicion, and should be considered by you with caution," that "[i]t must be carefully examined in light of other evidence in this case," and that the jury had "a right to take into consideration whether or not a witness has been promised consideration in relation to his punishment for his testimony." Clearly, the instruction given by the trial court was sufficient to inform the jury that they should view with skepticism the testimony of an accomplice witness who has been promised leniency in return for his testimony. Also, the jury, in IPI Criminal No. 1.02, was instructed on its duty to judge the credibility of witnesses generally, and that in judging a witness' credibility they could consider any "interest" the witness might have. (See *People v. Parks* (1976), 65 Ill. 2d 132, 357 N.E.2d 487.) Certainly defendant was not prejudiced by the trial court's failure to give his instruction exactly as it was tendered. In fact, it can be argued that the instruction as given was more favorable to defendant than the one tendered, in that it informed the jury that it had the right to consider promised leniency for testimony. Upon consideration of the evidence, we find that no error was committed by the trial court.

■■ Defendant's eighth contention is that the trial court improperly refused to give a non-IPI instruction which would have charged the jury that "the testimony of a narcotics addict be looked upon with great suspicion and acted upon with great caution." There was no error in the trial court's refusal to give the instruction. In the absence of an IPI criminal instruction, the decision whether to give a non-IPI instruction rests within the discretion of the trial judge (*People v. Finley* (1977), 49 Ill.

App. 3d 26, 363 N.E.2d 871), and a trial judge's refusal to give a non-IPI instruction concerning a narcotics addict's testimony has previously been upheld. (See *People v. Brown* (1973), 14 Ill. App. 3d 739, 303 N.E.2d 173.) Moreover, the jury had already been instructed that Orange's testimony was "subject to suspicion and should be considered * * * with caution." This was sufficient.

■■ ■ Defendant's ninth contention is that three photographs of the victim should not have been admitted because they were prejudicial and cumulative. We disagree. In a murder trial, the State has the right to prove the cause of death, even if the defendant stipulates thereto. (*People v. Kuntz* (1977), 52 Ill. App. 3d 804, 368 N.E.2d 114.) Defendant did not stipulate as to the cause of death, and the photographs in question tended to corroborate the fact that the victim died from asphyxiation. Also, the first photograph, which shows the victim with her ankles and hands tied behind her back with a scarf, corroborates testimony by Orange to that effect. The second photograph shows a liquor bottle near the head of the victim, corroborating Orange's testimony that he had two drinks from a bottle of "Early Times" in the victim's living room. The third photograph shows the victim's skirt pulled up and her undergarments in disarray, corroborating Orange's testimony that he saw Charlita Ponce's head between the victim's legs. Photographs of a deceased person, even if gruesome, are admissible if they are probative of facts in issue, and their admission rests within the discretion of the trial court. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6; *People v. West* (1977), 54 Ill. App. 3d 903, 370 N.E.2d 265.) In addition, such photographs do not become unnecessarily cumulative merely because there is oral testimony on the same issue. (*People v. West.*) The trial court did not abuse its discretion in admitting these photographs.

Defendant's 10th contention is that he was denied his right to waive trial by jury. Defendant failed to preserve this issue for review because he did not raise it at trial or in his motion for a new trial. (See *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Even assuming this issue is properly before us, we consider defendant's argument unpersuasive.

Defendant filed a motion to waive a jury trial with Judge Porter. Defendant was apparently concerned that some prospective jurors had, during the previous week, served in other criminal trials, one of which was a murder trial with facts similar to those in the present case. Judge Porter indicated to defendant that he would be allowed to waive a jury trial, but noted that there had previously been a mistrial in this case and that he had been the presiding judge during those proceedings. Judge Porter concluded that since he knew "just about everything * * * involved in this case," he should not be the presiding judge at a bench trial. At defendant's request, the venire panel was then dismissed and the

case was continued and transferred to Judge Cousins. On March 2, 1977, with Judge Cousins now presiding, defendant demanded a jury and proceeded to trial.

■■ It is clear from the record that defendant was never denied the opportunity to waive a jury trial. When, at defendant's request jury selection was put over and the case transferred to Judge Cousins, there was nothing to prevent defendant from then demanding a bench trial if he so desired. Instead, however, defendant asked Judge Cousins for a jury trial. Moreover, defendant certainly cannot argue that he had a right to a bench trial before Judge Porter in particular. Judge Porter properly recused himself, in view of the fact that he felt he may have been prejudiced due to his earlier involvement in the case. Clearly, defendant's contention that he was denied the opportunity to waive trial by jury is not supported by the record.

Defendant's 11th and 12th contentions are that he was denied his right to a speedy trial under Section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(a)), which reads in part as follows:

"Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, * * *."

On September 1, 1976, defendant's motion for a mistrial was granted. After several continuances, retrial began on November 22, 1976, but on defendant's motion a second mistrial was declared on that date. A number of continuances followed, with retrial commencing on March 2, 1977. Defendant argues that he was denied his right to a speedy trial by the delay between the mistrial on September 1 and retrial on November 22, 1976. Defendant further argues that he was also denied his right to a speedy trial by the delay between the second mistrial on November 22, 1976, and retrial on March 2, 1977.

■■ ■■ When a mistrial has been declared, the 120-day period referred to in section 103—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(a)) does not necessarily start to run again. Instead, in deciding whether the retrial commenced in time to satisfy the statute, consideration must be given to a defendant's constitutional right to a speedy trial. (*People v. Mason* (1969), 118 Ill. App. 2d 47, 254 N.E.2d 600.) Thus, the crucial determination becomes whether retrial began within a reasonable time. *People v. Johnson* (1976), 36 Ill. App. 3d 122, 343 N.E.2d 177.

■■ Between mistrial on September 1, 1976, and retrial on November 22, 1976, 82 days elapsed. The delay attributable to defendant, which includes delays caused both by his own motions as well as by motions by

agreement (see *People v. Donalson* (1975), 32 Ill. App. 3d 195, 336 N.E.2d 539, *reversed on other grounds* (1976), 64 Ill. 2d 536, 356 N.E.2d 776), amounted to 18 days. The delay attributable to the State, then, was 64 days. Between the second mistrial on November 22, 1976, and retrial on March 2, 1977, 101 days elapsed. Of this delay, 58 days were attributable to the defendant and 43 days to the State. Delays by the State of greater length than the respective delays in this case of 64 days and 43 days have not been found unreasonable, arbitrary or oppressive (see *People v. Johnson* (1976), 36 Ill. App. 3d 122, 343 N.E.2d 177; *People v. Mason* (1969), 118 Ill. App. 2d 47, 254 N.E.2d 600), and defendant has not mentioned any special prejudice caused him by either of these delays. (See *United States v. Ewell* (1966), 383 U.S. 116, 15 L. Ed. 2d 627, 86 S. Ct. 773.) We therefore disagree with defendant that he was denied his right to a speedy trial in either of the two instances cited.

■■ ■ Defendant's 13th contention is that it was error to permit the public defender to represent defendant, Orange and Charlita Ponce because of a potential conflict of interest between them. It is well settled that a defendant's right to effective assistance of counsel requires that his attorney not represent conflicting interests or undertake the discharge of inconsistent duties. (*People v. Wilder* (1977), 48 Ill. App. 3d 13, 362 N.E.2d 436.) We disagree with defendant, however, that he was denied this right to effective counsel. The public defender only represented Orange at his preliminary hearing. When Orange was promised leniency in return for his testimony, the public defender was no longer his attorney. Instead, at that time Orange was being represented by private counsel. We cannot assume, then, that the public defender's prior representation of Orange created any potential conflict of interest at the time of defendant's trial. (See *United States v. Donatelli* (1st Cir. 1973), 484 F.2d 505.) Also, with respect to the public defender's representation of Charlita Ponce, defendant concedes that her trial was severed from his own, and that she did not testify at his trial. It has been held that "[t]here is no inherent conflict of interest where several defendants are represented by the same counsel and assert inconsistent defenses at separate trials so long as one does not testify against the other." (*People v. Wilder* (1977), 48 Ill. App. 3d 13, 15, 362 N.E.2d 436.) We find that the public defender had no potential conflict of interest preventing it from providing defendant with effective assistance of counsel. Furthermore, assuming *arguendo* that a potential conflict of interest did exist, defendant failed to raise this issue during trial or in his motion for a new trial, and cannot assert that the public defender's dual representation was plain error, because he has not shown he actually suffered any prejudice from it. Defendant has waived this argument. See *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.

Defendant's final contention is that his sentence of 60 to 70 years for murder should be reduced. "[T]he imposition of a sentence is a matter of judicial discretion and * * * absent an abuse of this discretion, the sentence of the trial court may not be altered upon review." (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) In sentencing defendant for murder, the trial court considered the fact that defendant's crime was a particularly heinous one, and also the fact that defendant had previously been convicted of robbery, criminal trespass to property, theft, driving while intoxicated, and burglary. The trial court did not abuse its discretion with respect to the sentence it imposed on defendant for murder.

The judgments and sentences of the circuit court of Cook County are affirmed.

Affirmed.

GOLDBERG, P. J., and CAMPBELL, J., concur.