THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY M. EDDINGTON, a/k/a MICK, Defendant-Appellant.

Fourth District   No. 4—82—0700

Opinion filed December 31, 1984.

MILLER, J., concurring in part and dissenting in part.

Daniel D. Yuhas and Jonathan Haile, both of State Appellate Defender's Office, of Springfield, for appellant.

Lee J. Plummer, State's Attorney, of Jerseyville (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE TRAPP delivered the opinion of the court:

Defendant Jerry "Mick" Eddington was indicted on May 7, 1981, for the offenses of murder and conspiracy to commit murder. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(2), 8—2(a).) On November 3, 1981, a jury convicted defendant on the conspiracy count; the trial judge declared a mistrial on the murder count when the jury was unable to reach a verdict. On July 20, 1982, a second jury convicted defendant of the offense of murder. On August 4, 1982, he was sentenced to an extended term of 50 years' imprisonment, and the conspiracy to commit murder charge was dismissed. Defendant appeals from the judgment of the circuit court of Jersey County. We reverse the judgment and remand the cause for a new trial.

Defendant raises the following issues on appeal: (1) whether he was proved guilty beyond a reasonable doubt where the only evidence against him was the extensively impeached testimony of codefendant Hill, for which there was no significant corroboration, (2) whether the State improperly focused the jurors' attention on his failure to testify by bringing attention to the fact that defendant testified at his prior trial, (3) whether improper remarks made by the State during closing argument, commenting on defendant's failure to call witnesses, misstating the evidence, and defining reasonable doubt to the jury constituted reversible error, and (4) whether the trial court abused its discretion by imposing a 50-year extended term sentence on defendant, in view of the disparity between this sentence and the 30-year sentence imposed on codefendant Hill.

The State argues that defendant has waived his second and third arguments by his failure to raise these points in a timely post-trial motion. The jury verdict was returned on July 20, 1982, with the sentence entered on August 4, 1982. Also on August 20, the court denied defendant's motion for stay of mittimus. Defendant's post-trial motion was thereafter filed on August 31, 1982, and, after several continuances, argued and denied on October 26, 1982. Notice of this appeal was filed on the latter date. The State contends that since defendant's post-trial motion was not filed within 30 days of the return of the verdict, it was untimely under section 116—1(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 116—1(b)), and, further, since it was filed after the defendant was sentenced and delivered to the penitentiary under a mittimus, that the trial court lacked jurisdiction to consider the motion (see *People v. Russo* (1962), 24 Ill. 2d 311, 181 N.E.2d 103, and *People v. Wakeland* (1958), 15 Ill. 2d 265, 154 N.E.2d 245). The record reflects that on July 20, after the jury returned its verdict and the court set the sentencing hearing

for August 4, defense counsel inquired whether he would have 30 days from that date for a post-trial motion, and the court answered affirmatively. Similarly, after pronouncing sentence on August 4, the court advised defendant of his right to file a post-trial motion within 30 days of that date and, if that motion were denied, his right to appeal. At the October 26 hearing on defendant's post-trial motion, defendant presented a motion to dismiss a notice of appeal filed between sentencing and the hearing on the post-trial motion, which motion was allowed without objection by the State. The State fully participated in the ensuing hearing on the post-trial motion.

■ Section 116—1(b) of the Code of Criminal Procedure of 1963 requires that a post-trial motion be filed within 30 days following the entry of a finding or the return of a verdict, and failure to file the motion within the allotted time is a ground for its denial. (*People v. Colletti* (1971), 48 Ill. 2d 135, 268 N.E.2d 397.) In *People v. Gauwitz* (1980), 80 Ill. App. 3d 362, 400 N.E.2d 92, although not considering the jurisdictional question herein posed by the State, this court considered a timeliness challenge under section 116—1(b) in similar circumstances. *Gauwitz* held that where the State participated fully in the argument on the post-trial motion and the question of timeliness was first raised on appeal, the State had waived the timeliness argument. We likewise reject the State's timeliness argument as to the requirements of section 116—1(b).

■ The State next argues that the trial court lacked jurisdiction to consider defendant's post-trial motion. In Illinois, the common law rule permitted a trial court to retain jurisdiction over a judgment until the adjournment of the term, except that in criminal cases the trial court lost jurisdiction before the end of the term when the defendant's sentence was executed. Under the practice in this State, when a person accused of a crime was convicted, sentenced, and delivered into the custody of the proper penitentiary officer under a mittimus, the sentence was considered executed and the court lost jurisdiction. That rule was later changed so that the court's jurisdiction ended 30 days from the entry of the judgment, *i.e.*, the entry of judgment as under Supreme Court Rule 606(b) (87 Ill. 2d R. 606(b)), rather than the expiration of the term; however, in criminal cases, trial courts lost their jurisdiction as soon as the sentence was executed, if prior to 30 days. Therefore, in criminal cases, the trial court retained jurisdiction to vacate, modify, or set aside a judgment until the sentence was executed, or 30 days after the sentence was imposed, whichever occurred first. (See *People v. Hills* (1980), 78 Ill. 2d 500, 509, 401 N.E.2d 523, 527.) Nevertheless, we find the general rule inapplicable, given the

circumstances of this case.

First, this court in *People v. Carnes* (1975), 30 Ill. App. 3d 1030, 332 N.E.2d 674, where the defendant had been sentenced and mittimus issued prior to the time his post-trial motion had been heard and ruled on, stated:

> "The practice of ruling on post-trial motions *after* the imposition of sentence and delivery of defendant into confinement in the penitentiary is an anomaly which creates problems never before called to our attention. The customary practice is for the trial judge to hear and rule on the post-trial motions prior to imposition of sentence, and certainly prior to issuance of mittimus and transfer of the defendant to the penitentiary.
>
> * * *
>
> The delay in hearing and ruling on defendant's post-trial motions effectively precluded defendant from prosecuting a direct appeal. It appears that the State's Attorney, defense counsel and the trial judge were unaware of the trial court's loss of jurisdiction. It is manifestly unfair and constitutes a denial of due process to relegate defendant to a position from which only constitutional errors are available to him on appeal from the order denying post-conviction relief. He is, in such a process, effectively denied the right to seek appellate review, on direct appeal, of his claims of error which are not of constitutional magnitude." (30 Ill. App. 3d 1030, 1032-33, 332 N.E.2d 674, 676-77.)

This court held that fundamental fairness and the requirements of due process required finding plain error, and reversing and remanding for a new trial. Here, defense counsel argued at the sentencing hearing on August 4, 1982, in support of a motion for stay of mittimus, referring to discussions he had previously had with the court that there was case law saying that the court loses its jurisdiction of defendant once he is in the Department of Corrections. The State objected to the defendant's motion and argued that, since sentence had been imposed, the law required that defendant be transported to the Department of Corrections within three days. The State's Attorney said that if the defendant were needed for post-trial motions, a writ of *habeas corpus ad subjiciendum* could be prepared and he could be transported back. The trial court, without commenting on the possible loss of its jurisdiction, denied the motion to stay the mittimus, stating that the post-trial motion would be strictly on the record, as a matter of law, and that it would be unnecessary for the defendant to be present for the post-trial motion. The trial judge further stated that, under

the circumstances, he believed that the appellate court would consider the fact that the motion to stay mittimus had been denied. Given these circumstances, we believe that, as in *Carnes*, it would be manifestly unfair to deny defendant the right to seek appellate review, on direct appeal, of his claims of error which are not of a constitutional magnitude.

Second, under the narrow terms of the revestment doctrine, litigants may revest a court which has general jurisdiction over the matter with personal and subject matter jurisdiction over the particular cause after the 30-day period following final judgment during which post-judgment motions must ordinarily be filed. In order for the rule to apply, the parties must actively participate without objection in proceedings which are inconsistent with the merits of the prior judgment. Here, in addition to the trial court's representations to defendant and defense counsel with respect to his rights and the time for filing a post-trial motion, and the lack of any objection by the State's Attorney, we note that the record sheet in this case reflects that on September 14, 1982, the State's Attorney moved that the cause be continued for post-trial motions from that date to September 20, 1982. When the post-trial motion was called for hearing on October 26, 1982, the State's Attorney participated fully and without objection. See *People v. Kaeding* (1983), 98 Ill. 2d 237, 456 N.E.2d 11.

As the notice of appeal was filed on the date on which the post-trial motion was heard, notice was timely within the meaning of Supreme Court Rule 606(b) (87 Ill. 2d R. 606(b)).

By way of introduction, we first review the persons allegedly involved in the charged offense, and the events as they were to have unfolded.

The case involved the planning of the murder of Timothy Clark, its execution near the end of August 1980, and subsequent efforts to conceal the crime by persons other than defendant. The persons allegedly involved in the murder conspiracy had also been involved in other illicit activity. James Hill was the chief witness for the prosecution. He had been a business major at Southern Illinois University at Edwardsville in 1980. Hill also worked for Metropolitan Insurance Company in Granite City, as a bartender at Stages, a nightclub in East St. Louis, and as supplier for a drug ring which he organized and operated. Harry Stinley, Hill's roommate from May to September 1980, and Robert Bagley had also been college students. Bagley worked with Hill at Metropolitan Insurance Company in Granite City and at Stages in East St. Louis. Defendant Jerry Eddington was a bartender at Stages. Stinley, Bagley, defendant, and Tim Clark

worked for Hill's drug operation.

During the summer of 1980, Hill became interested in Clark's wife, Vicki, and dissatisfied with Clark's failure to promptly pay his debts for drugs and other items. Initially, an insurance fraud scheme was set into play involving the Clarks, Hill, Stinley, and Bagley. Early in August 1980, items from other persons' homes were brought to the Clark residence, pictures were taken, and the items were returned to their respective owners. Clark filed an insurance claim on his renter's policy with Metropolitan Insurance Company. There is no evidence suggesting defendant's participation in this venture.

Hill also developed a plan to murder Tim Clark. This conspiracy began in July 1980, with Hill discussing with Stinley ideas about committing the perfect crime. Hill relied upon Bagley to telephone Clark and offer him a job distributing drugs on the west coast. Bagley, using an alias, made the telephone call, and Stinley went to Clark's apartment to observe Clark's reaction to the phone conversation. Stinley reported back to Bagley and Hill that Clark had taken the bait. Bagley, again using an alias, telephoned Clark later in August to assure Clark's acceptance of the fictitious job and tell him when he would be picked up. When Clark expressed reluctance, Bagley assured him that Hill would accompany a member of the drug organization to meet him. The defendant was not implicated in the planning stages of the murder conspiracy.

According to Hill's testimony, several days before the murder Clark called and cursed him for having an affair with his wife. Hill and Stinley later met Clark's wife at her request. She had a black eye and the side of her face was swollen. Hill told police to bring Ms. Clark and her children to his residence, whereupon they commenced living with Hill.

The murder was allegedly committed on August 28, 1980.

Thereafter, the plan for the perfect crime began to unravel. Stinley dated Tim Clark's sister, Jackie Caminiti, from July to October 1980. After their October breakup, Stinley began reading the Bible and stopped drinking and taking drugs. After Thanksgiving passed with no word from Tim Clark, Jackie filed a missing person's report on November 30, 1980. On December 4, 1980, she told Stinley she had filed the report. In a fit of conscience, Stinley told Jackie what he knew of the plan to kill her brother.

Stinley then told his story to Sergeant John Wiese of the Madison County sheriff's department and to Deputy Steven Nonn. After assurances of immunity from prosecution, Stinley gave a videotaped statement, wherein he said Hill had told him that Hill, "Bo," and defend-

ant were going to pick Clark up and get rid of him. Caminiti's recollection of the circumstances under which her brother left the area tended to confirm Stinley's story.

Stinley agreed to cooperate with authorities, and a court order was obtained on December 5, 1980, to tape conversations between Stinley and Hill. Stinley went to Hill's apartment wearing a body wire and engaged Hill in conversation. Hill named defendant and Bagley but did not give the location of Clark's body. On December 7, 1980, telephone conversations between Stinley and Hill were recorded by the Madison County sheriff's department. Hill informed Stinley that Clark was dead and, because of decomposition, the body could not be identified. Stinley voiced concerns over identification through Clark's dental records and X rays.

On December 10, 1980, Detective Fisher, Madison County sheriff's department, interviewed Hill as a routine check to back up Stinley's story that a police investigation of Clark's disappearance was underway. Hill told Fisher that the last time he saw Clark, he gave Clark a ride and let him off in Granite City near Hill's workplace. Clark had a job somewhere and was carrying his suitcase to catch a ride.

Several days later, a Mr. Parmley threatened Vicki Clark. On December 14, 1980, Hill called Detective Nonn to throw authorities off. He told Nonn of the threats and suggested that he was afraid of Tim Clark's coming back, since he was living with Clark's wife.

About December 15, 1980, Hill and Bagley went to alter Clark's remains near Grafton, Illinois, to preclude identification. They removed the skull but somehow left 11 teeth at the site and did not destroy the skeleton.

On January 23, 1981, warrants were obtained for the arrest of Hill, Vicki Clark, Bagley, and defendant.

On January 24, 1981, police teams executed the arrest warrants, search warrants, and an eavesdrop order. Hill and Vicki Clark were arrested and their apartment searched for items related to the murder and drug sales. Bagley was arrested next. Defendant was arrested later in the day after police monitored a phone conversation wherein Hill informed defendant that he and Bagley had been arrested.

Hill declined to talk to Detectives Fisher and Rushing when he was arrested. After playing part of the taped conversations for Hill, detectives let him make a tape and listen to his voice for comparison. Thereafter, Hill made a statement laying the blame for Clark's disappearance on defendant and an unidentified person. He said he had an

idea Clark might have been killed and told authorities he had taken Clark down to a place in Granite City, letting him off with his suitcase. Hill met defendant, drove north of Alton, and let defendant out of the car, returning to pick him up later. Hill and defendant then went drinking in Granite City. Hill acknowledged that he had signed, as true, a typewritten statement, thus "putting the rap" on defendant. He did not recall saying defendant had offered him money to make a phone call to Clark, but said if that was in the statement he assumed he also gave authorities that information.

Clark's remains were located by Lieutenant Robert K. Hertz, Madison County sheriff's department, in a ravine in a rocky area near Grafton. Two .25-caliber projectiles were recovered from the chest cavity. The site around the remains was excavated to a depth of eight to 12 inches and the area thoroughly searched, but no other projectiles or cartridges were found.

On January 26, 1981, Bagley gave police a statement on the advice of his counsel. He told authorities he had been aware of a plan to kill Clark as a result of a drug debt; that he had made several phone calls for Hill to set Clark up; and that he had gone to the remains with Hill on December 15 to remove the head. He told police he had not been present at the time of the murder and that Hill had chopped the skull from the remains in December.

Bagley subsequently told authorities it had been he who chopped the skull from the remains. Bagley was not sentenced until after defendant's second trial.

On May 5, 1981, Hill pleaded guilty to murder, obstructing justice, and unlawful calculated cannabis conspiracy, and entered into a plea agreement under which he was to be sentenced to 30 years' imprisonment on the murder charge, three years on the cannabis charge, and three years on the obstructing charge, all sentences to run concurrently. The State dismissed a case of theft, a case involving solicitation of murder, and other counts of the murder information, and recommended Hill never be incarcerated in a facility where Jerry Eddington is incarcerated. Hill agreed to testify against defendant consistent with a statement he agreed to give authorities. Hill did not have to name his drug contacts. Hill had not been sentenced at the time of defendant's second trial.

On May 12, 1981, Hill's videotaped statement was taken, Hill saying he had been present at the time of Clark's murder and that defendant had shot Clark.

On May 20, 1981, Hill told Detective Nonn that he had shot Clark first with a .25-caliber gun and defendant thereafter had shot Clark

*twice* with a .357.

Defendant was brought to trial later in 1981, and thereafter in this second trial in 1982. In view of the complexity of this case and the nature of our rulings herein, the evidence adduced at defendant's second trial is assembled at length:

First, deputy sheriff Steven Nonn, of the Madison County sheriff's department, described the various phases of the investigation, including much of the above. He testified that Stinley implicated defendant, as well as Hill, in a taped statement on Clark's murder on December 4, 1980; that Bagley implicated defendant, as well as Hill, in his statement of January 26, 1981; and that Hill implicated defendant in his statements.

Nonn testified at length about taped conversations between Hill and Stinley. He said that in the call of December 5, 1980, Stinley first mentioned defendant's name, asking whether Hill or defendant shot Clark. Hill then implicated defendant and said that he would not have had the guts to do it. Stinley acted relieved and suggested this raised Hill in his eyes. Nonn recalled that in the first (of two) taped phone conversations between Stinley and Hill on December 7, 1980, Hill tried to calm Stinley down, telling him he would end up involved and get everyone in trouble by his nervousness. Stinley responded that he just wanted to be sure things would turn out all right. He asked Hill whether everyone else who was involved could be trusted. Hill responded that there was no one else but defendant. Stinley asked whether Hill had talked to defendant lately, and Hill responded that he saw defendant all the time. Stinley asked whether Hill had paid defendant enough to prevent him from talking. Hill said defendant was the person who had done everything, so there was no reason he should say anything. Later on December 7, Stinley again spoke to Hill, and asked Hill whether ne was going to call defendant. Hill said he would talk to defendant and was going to see him later. Hill told Stinley that Vicki Clark had talked to Jackie Caminiti and the missing person's report was just routine. Hill referred to a "list" Tim Clark had left behind when he left for the fictitious job. Stinley asked Hill whether he was going to call Bagley. Hill said he was not, since Bagley was not on Clark's "list."

Detective Ronald G. Tune, of the Madison County sheriff's department, testified he executed a search warrant on Hill's residence on January 24, 1981. He recalled drugs and records of the drug sale operation were found. The records were made exhibits at trial.

William Brave, Madison County sheriff's department crime-scene evidence technician, testified identifying items from the scene of

Clark's remains, and a .25-caliber pistol and shells taken from defendant's residence.

Stinley, at the time of trial a second lieutenant in the Air Force, testified that Christianity had changed his life. He testified he had been Hill's roommate and thus had met Bagley, Clark, and defendant in 1980. He said Hill had a drug sale operation and Clark had fallen in debt to Hill. Hill told Stinley how frustrated he was over getting Clark's payment and suggested he might have to coerce him into paying. Stinley testified that Hill had concocted the insurance fraud scheme whereunder Clark filed a claim on his renter's insurance. Stinley acknowledged his part in the fraud scheme and said he did not believe defendant had been involved.

Stinley continued, saying that around July 1980, Hill began discussing an elaborate scheme to get rid of Clark. Stinley described Bagley's phone call to set Clark up, and his own visit to Clark's apartment to observe Clark's reaction. Stinley said he believed Hill had mentioned that defendant was to accompany him to meet Clark and get rid of him. On the day Stinley thought Hill carried out his intention to kill Clark, he said defendant came to their apartment and left with Hill. He said as far as he knew they took Bagley's *maroon* Chrysler Cordoba. He said it had been *mentioned to him* that Bagley's car would be used. Stinley said he stayed home that night. He recalled that Hill called him later in the evening and said it had been awful and they were going to stay out and get drunk. Stinley had last seen Clark several days earlier. He said he had not believed Clark would be killed until it was over. Stinley testified that several days later, Hill had laughed and said it had been kind of funny the way Tim had begged for his life.

Stinley described going to the police in December 1980 and his taped discussions with Hill on December 5 and 7. A portion of the first December 7 phone call was played before the jury. He said that in the second phone conversation on December 7, Hill had threatened that he could end up the way Tim had if he cracked and told police what he knew. Stinley said he had never talked to defendant about the plan to murder Clark and had known of his involvement only through Hill's statements.

Stinley testified that Bagley's car had previously been used for a drug deal involving himself, Hill, Bagley, and defendant. Stinley and defendant picked up two persons from defendant's house and delivered them to a motel outside Collinsville to sell drugs to Hill.

On cross-examination, Stinley said Vicki Clark and her children had moved into the apartment he shared with Hill prior to the date he

thought Tim Clark had been murdered. He said he had been to defendant's house in Cahokia more than once in the summer of 1980. Stinley recalled in cross-examination that in his December videotaped statement to police he had been asked whether he had been told how Clark was to be killed and had answered, "[Hill] told me they were to pick up \*\*\* they were going to \*\*\* him and Bo \*\*\* and Mick \*\*\* alias 'Jerry' were to pick up Tim at his house."

Stinley mentioned several guns in his testimony: He said he carried his father's .38-caliber gun on the Collinsville drug deal, and again from the time he went to police in December 1980 until Hill was arrested in January 1981. He also said Hill had mentioned owning a .357 but that he had not seen it.

On redirect examination, the assistant State's Attorney asked Stinley how he had identified defendant for police officers. Stinley had given officers a physical description, told them where defendant lived, that he sold drugs for Hill, and "told them that he used to be \*\*\* I heard from Jim that he used to be in the Wind Tramps," a motorcycle club.

James Hill testified that in the summer of 1980 he was a business student at Southern Illinois University in Edwardsville. His drug sale operation was set up as a business, with people on salary selling drugs for him. He kept records, established weekly times for each to call and meet with him, set a minimum for each to sell, and encouraged them to exceed it by offering bonuses. He said the average weekly "take" of someone selling his minimum amount was between $200 and $350. Hill testified that defendant sold minimum amounts during the summer of 1980. Hill grossed about $300,000 per year in drug sales and took a 20% profit.

Hill testified that defendant set up a large transaction at a motel in Collinsville, wherein Hill purchased a quantity of marijuana for between $9,000 and $11,000 cash. Hill said he talked to defendant four to five days a week and saw him about four times a week in July and August 1980. Hill identified a notebook showing his drug sales from September 15, 1980, through January 22, 1981, as the most recent record of his drug sales to defendant. He had destroyed most of his records, as he was trying to get out of the drug business and anticipated a drug arrest. Hill described the dates and prices of drugs sold to defendant based on his records:

"September 15th quaaludes—$975; September 15th, pills—$190; 23 September, pills—$400; September 27th, pills—$190; 27 September, smoke [marijuana]—$35; November 5th, pills—$150; November 8th, quaaludes—$125; December 9th, smoke—

> $205; 16th and the 26th both smoke at $205 each; 3rd of January, smoke—$780; 7th of January, smoke—$780; 14th of January, smoke—$309; 22nd of January, smoke—$1420; smoke, 22nd again, $770.''

Hill testified that after the summer of 1980, defendant had become an "independent" and had no longer been on salary in his drug organization.

Hill continued, testifying that by the summer of 1980 he had known defendant about a year and a half and Tim Clark since January 1980. Hill thought defendant may have met Clark once at Hill's home when they were there at the same time for several minutes in January or February 1980.

Hill testified that Tim Clark had reduced his drug debt to $150 by August 1980. Clark also owed money borrowed to buy a freezer. Hill further considered Clark in debt for tires he gave Clark to sell which disappeared from Clark's residence, and for $50 he gave Clark to buy items to leave for his new "job." At the time of Clark's disappearance, he owed Hill between $800 and $900, including $400 to $500 interest for money owed at most two to three months. Although Hill expected to recover the money Clark owed through the insurance fraud, he said he decided to kill Clark, because he considered him a threat to his drug business.

Hill testified Stinley first suggested the idea of murdering Clark. He further stated that while rappelling with Clark, Stinley had suggested that they untie the rope and let Clark fall, and he had rejected the idea. Hill said Bagley first suggested the insurance fraud scheme. The testimony of Stinley and Bagley contradicted Hill on such points.

Hill continued, testifying he decided to murder Clark in July 1980: He said he discussed ideas for committing the murder with Stinley and with Bagley. Both assisted him in setting Clark up. Hill asked defendant to go along and kill Clark because he considered him a friend and business acquaintance and trusted no one else. Hill implied there was a possibility of defendant rising in the drug ring, though he never expressed an interest in doing so. Hill said he chose Thursday, August 28, as the date for the murder because it was defendant's night off at Stages. Hill asked defendant for a gun and told him why he wanted it. Defendant said he would take care of it. Hill said he believed defendant knew how to use guns because he talked about hunting and told Hill that when he was in the service in North or South Carolina he had problems with some men related to drugs and had to kill a man.

Hill testified, describing his activities on the day Clark was killed:

In the morning, he drove Clark around on errands and returned him to his apartment. Hill then took a final exam, stopped at a nursery and bought Vicki Clark flowers, and exchanged cars with Bagley in the afternoon. Bagley had volunteered his car for use in the murder. On direct examination, Hill said he had taken Bagley's 1977 *blue* Monte Carlo; on cross-examination he said he had taken Bagley's *tan* Monte Carlo. Hill said he called defendant in the afternoon "and he said, 'I will be over in a half an hour, forty-five minutes.' " Defendant came to Hill's apartment, and the two set off in Bagley's car. They picked Clark up and told him they were going to bury a printing press for the drug organization. Hill directed defendant to a location outside Grafton. Hill continued, testifying that on exiting the car Clark and defendant carried shovels to bury the nonexistent press. Clark led the way down the rocky terrain. Hill said defendant handed him a .25-caliber gun and he shot Clark in the back, the bullet entering around the shoulder. Clark spun around and begged for his life. Hill shot Clark three or four more times. Clark fell to the ground on his back, moaning and unconscious. Hill said defendant then pulled a large bluesteel revolver from his boot, stood near Clark's feet and shot down *three or four times*. He testified one shot hit Clark's head and each bullet jerked the body from the ground. Hill had defendant remove Clark's wallet for identification reasons, ascended to the car and put the shovels in the trunk. Hill said defendant returned to the ravine and came back to the car within 15 to 20 seconds. Defendant told Hill he had used a .357 with hollow point bullets. Hill said he put the .25-caliber gun on the car seat and told defendant to dispose of the weapons. Defendant and Hill drove to Alton to drink and "establish an alibi." About five minutes after they arrived at a tavern, Hill told defendant he was going next door to call someone locally. Instead, Hill said he called Stinley and told him Clark was dead and they were staying out to get drunk.

Hill also testified as to discussions with Stinley in December 1980. He said that in a phone conversation Stinley asked if he was there when Clark was murdered. Hill said he told Stinley he was in the car.

Hill testified that later in December, while drinking with Bagley, he discussed the possibility of Clark's remains being identified, and they decided to destroy the remains. Bagley was afraid of Hill, however, and requested a gun to carry and a third person, of his choosing, to drive them to and from the site. Hill said he got a .25-caliber gun from defendant, but did not disclose his purpose. Hill gave the gun to Bagley when they went to the remains two or three days later. Bagley and Hill were let off near the site by a Mr. Bachantin.

Equipped with a knapsack, machete, charcoal and gasoline, they located the remains. Bagley struck the neck area with the machete several times and put the skull and jawbone in a sack, struck the body several times with the machete, grabbed the sack, and returned to where Hill was watching the road.

Hill testified that although he had never killed anyone else, he could have told Stinley or Bagley that he had. He said he may have said he had access to a gun his father owned. He was unclear on what he had told Bagley about Clark's murder. Hill acknowledged that when he gave authorities his statement in May 1981, Stinley and Bagley had already made numerous statements implicating him, and the only person left which he could use to "get a deal" was the defendant. He said he had not told authorities that he also shot Clark until May 25, 1981. He further acknowledged that in written notes for his lawyer in preparation for his defense, he may have said that he mentioned defendant's name in front of Stinley and then kept it up to avoid repercussions, and *he wrote that the defendant had not been present at the murder site.*

Dr. Steven Paul Nurenberger testified that he autopsied Clark's remains. He opined that Clark bled to death. He described a hole in the right scapula as made by a small caliber bullet, *i.e.*, a .22- or .25-caliber, and a grazed defect in the dorsal edge of a rib, the only two identifiable gunshot wounds to the bones.

Randall Rushing, an Illinois Department of Law Enforcement special agent, testified that he arrested Hill on January 24, 1981. He said Hill's statement on that date was that he had participated in a plan precipitated by defendant, an associate of a pharmaceutical company, who wanted to have Clark killed because Clark owed defendant money.

Robert L. Bagley testified Hill came to him in mid-July 1980 with a plan to strong-arm Clark into repaying Hill. Hill told Bagley he was involved with Clark's wife. The plan involved calls to pressure Clark by representing themselves as higher-ups in the drug ring. Bagley also became aware of Hill's involvement in Clark's fraudulent insurance claim.

Bagley continued describing his phone calls to set Clark up for the fictitious job distributing drugs: Using an alias, he last called Clark on Monday, around August 25 or 26, and said two people would pick Clark up Wednesday or Thursday around 6 or 6:30. When Clark sounded reluctant, Bagley told him Hill would be there. Bagley told Clark not to tell anyone he was leaving town and to wear new clothes. Bagley testified that at that point, he was aware Hill was go-

ing to commit a homicide. Hill had told him that defendant would accompany Hill to get rid of Clark.

Bagley said he owned three cars at various times in 1980. From September 1979 to June 1980, he owned a maroon 1979 Dodge Magnum; *from June to October 1980, a tan 1975 Monte Carlo*; and from October 1980 to January 1981, a Ford Galaxie 500.

Bagley testified about the day Hill was to pick up Clark: Bagley said he loaned Hill his *1975 tan Monte Carlo* in exchange for Hill's new four-cylinder Plymouth. Bagley told Hill he wanted his car back that evening because he had insurance appointments set up. Hill said he would return the car by 7 or 8 p.m. That night Bagley decided not to drive Hill's car to his appointments and canceled one at 6 o'clock in Granite City and one at 9 o'clock in Edwardsville. Bagley said he remained at his apartment with his roommate that evening.

Bagley testified that he reached Hill by phone after midnight and agreed to exchange cars in the morning at Metropolitan Insurance. The next morning Hill said everything was taken care of. He told Bagley that if anyone asked, he had been with Hill and defendant drinking in Edwardsville the previous night.

Bagley continued, testifying that when he showed up for work a few days later at Stages, defendant was working and inquired loudly whether they had not had a good time drinking in Edwardsville the other night. Bagley testified he had never gone out with Hill and defendant as a threesome.

Asked whether he ever talked to defendant about the murder, Bagley testified that he tried to approach the subject at Stages and defendant would never comment about it, but acted as if he understood.

Bagley testified that in September or October 1980, however, Hill told him about the murder one night after work. Hill said he pulled out a .25-caliber gun and shot Clark four times in the back and chest and, when Clark went down, "they" shot him *twice* with a .357. Bagley said he assumed Hill meant defendant shot Clark with the .357, but admitted he knew nothing of defendant's involvement in the murder except what Hill told him.

Bagley testified, describing his trip to Clark's remains with Hill: He said Hill came to him about the first week in December when Madison County police began investigating Clark's disappearance. Hill had determined that Clark had dental records and said they had to get rid of the evidence. Hill said that, apart from himself and defendant, Bagley was the only one who knew the whole story of Clark's murder—the only one who could put Hill in jail. Bagley said that a few

days after Clark's murder, Hill told him he had previously killed someone else, without elaborating. Bagley said he had been afraid of Hill. Bagley identified defendant's .25-caliber automatic pistol, People's exhibit No. 24, as that provided by Hill for the trip to Clark's remains. He said he chopped the skull from the neck and put it in a bag without looking at it, striking all over the remains with the machete before they departed. He threw the machete in the river and returned the gun to Hill. Hill disposed of the skull and mandible, telling Bagley he had reduced the skull to ashes and spread them "between Bunker Hill and Caseyville and 157."

Bagley further testified that he spoke to defendant at work about this trip to the remains:

"Q. [By Assistant State's Attorney]: Did you ever talk with the defendant *** about going up to that body?

A. I never did, sir, no. Mr. Hill did.
* * *

Q. Did you ever tell [defendant] that you had gone to that body.

A. I had mentioned the fact to him that I thought everything was taken care of after the incident.

Q. How did you let him know what you were talking about, did you tell him?

A. I told him at Stages.

Q. That you went up to the body?

A. Yeah.

Q. You said everything was taken care of?

A. Yes.

Q. What did that man say?

A. Nothing."

Bagley said he again spoke to defendant about the trip in January 1981, several days after having dinner with Hill and Vicki Clark on January 1, 1981. Bagley said he told defendant he hoped everything was taken care of, and defendant said he hoped so, too. Bagley acknowledged that in his interview with authorities on January 26 he said that when he saw defendant after the January dinner he told defendant what happened; defendant said he hoped everything was taken care of; Bagley said he thought it was; and defendant said he hoped it was.

Bagley testified Hill gave him a .25-caliber gun similar to the one in evidence to carry on a large drug deal defendant set up for Hill. He said Stinley also carried a gun on the venture and he saw a sawed-off shotgun at defendant's house. Bagley received $50 for the use of his

car in the deal.

Bagley described defendant's .357 as a dark four-shot gun, eight to 10 inches long. He said defendant had shown it to him at defendant's house and said it was a .357 Bulldog. Bagley said defendant sometimes carried the gun in his boot when working at Stages. Bagley also testified that Hill had showed him a combat .45 that he owned at his residence late in 1979.

Bachantin testified and contradicted Bagley's testimony that he had been asked for assistance several days before he rode out toward Grafton with Bagley and Hill. He said Bagley called only once—immediately before picking him up.

Robert J. Hertz, Madison County deputy sheriff, testified he located Clark's remains at the bottom of a ravine outside Grafton at about 2:30 p.m. on January 24, 1981.

Alva Busch, Department of Law Enforcement crime-scene technician, testified about his processing of the scene of Clark's remains, leading to admission of numerous photographs. He described excavating the site beneath the remains and searching the area. He testified that he found two .25-caliber projectiles inside the body (held in place by the T-shirt), and that no other projectiles or shell casings were found.

The prosecutor had crime-scene investigator Busch bring defendant's .357 Magnum—purchased after Clark's murder—to court. During his testimony, Busch pulled the gun from his boot, and said it had not interfered with his walking. Officer Rushing had also testified he had carried a .357 gun in his boot and had no trouble walking.

John Weese, Madison County deputy sheriff, testified he had been assigned the missing persons report on Clark and had gone to Caminiti's residence to talk to Stinley when she called. He took Stinley in to tell his story to a detective.

R.S.W. Doren, special agent, testified he arrested defendant on January 24, 1981. At that time, defendant said he did not remember meeting anyone named Tim Clark. Defendant was asked whether he talked to Hill that day, but did not answer. Defendant was then confronted with the fact that police knew he talked to Hill that day, and admitted having had a conversation.

Clarence Surrey, detective, testified he received custody of defendant at St. Clair County jail on January 26, 1981. He said defendant told police he recalled an occasion in August 1980 when he went to Hill's house and purchased some life insurance. Police asked defendant why Hill would bring his name into the investigation. The only reason defendant offered was that there was a move afoot to

unionize workers at Stages and he had been uncertain whether he supported it. Surrey said that when asked about the night of Clark's murder, defendant recalled going to the University at Edwardsville with Hill and Bagley, and said they ran into three individuals identified as Thomas Smith, "Turkey," and Kevin Case. Surrey testified that defendant said he then accompanied Bagley and Hill drinking. Surrey further testified that when police asked defendant if he felt he could kill someone for $100,000, defendant first said he would not kill for money, but later changed his mind and said he might for $100,000, or if someone "pissed him off or hurt someone."

The parties stipulated that *People's exhibit No. 24 was a .25-caliber automatic, taken with other guns from defendant's residence,* and *not the gun which fired the .25-caliber bullets found in Clark's chest cavity.* The parties also stipulated to the admission of telephone company records for the residences of Hill and, defendant from August 1980 through January 1981, showing long-distance phone calls, including numerous calls between them. The stipulation showed calls on August 28, 1980, the alleged date of the murder, at 9:12 a.m., from Hill to Metropolitan Life; at *5:02 p.m., from Hill to Eddington*; and at 7:53 p.m., a collect call from Timballo's restaurant and tavern in Alton to Hill's apartment. On December 7, 1980, the date of the taped telephone conversations between Stinley and Hill, the records showed a one-minute call at 6:18 p.m., from Hill to Stinley; a call at 6:48 p.m., from Hill to Eddington; and a call at 6:51 p.m., from Hill to Stages. There was no record of local calls, which would include calls between Hill and Bagley.

The defense presented the testimony of Anthony Edmond Clark, Tim Clark's 16-year-old brother. Anthony said he sometimes stayed with his brother Tim during the summer of 1980 and knew James Hill. Tim said he would be leaving the area for reasons related to dealing in drugs. Anthony said he was present when Tim was picked up to leave for his "job," having arrived at Tim's about 3:30 p.m., and estimated *his brother was picked up at 4:30 p.m.* Anthony's recollection of the day had become weak:

"Q. Now, do you recall testifying on this matter previously?

A. Yes.

Q. And do you recall what your testimony was with regard to the time that your brother left that afternoon?

A. Pretty much so.

Q. At that time *didn't you say that he had left at 1:30 maybe 2:30 at the latest?*

A. Well, see, I couldn't get my time straight at what time

the mail was that is why I couldn't get it straight.

Q. You did testify that at 1:30 or 2:30 at the latest?

A. Yes.

Q. And did you go into the police department some time along in December and talk to them about that day?

A. Yes.

Q. At one time did you have an interview with an officer at the Madison County police department?

A. Yes.

Q. Now, with regard to what did you see then that afternoon?

A. Well, I was outside when my brother was taking a shower messing with his pistols and he got out of the shower and we waited there for about 15 or 20 minutes and then Hill and this Eddington come, they was driving down the driveway and he said good-bye and I was standing there and they got in the car and left.

Q. And what time would you say that was?

A. About, that would be about 4:30 or so.

Q. What color was the car?

A. Well, I can remember from what I can remember is *it was a light colored car.*

Q. Light colored car?

A. Yeah, that is about all I can remember.

Q. Now, again, referring to the time when you have testified previously regarding this matter I believe you were asked a question and you answered that the *car was dark colored,* is that correct?

A. I said it was a dark colored car?

Q. Can you tell the jury what color the car was? Did it look like a dark colored car?

A. I don't think so, Not that I can remember.

Q. Now, you just previously testified that Jim Hill and who you guessed was Jerry Eddington were in the car, do you recall your testimony regarding that matter?

A. Yes.

Q. Didn't you say previously that there were *three people in the car?*

A. I said it kind of looked like it but I didn't know if it was the way the car was sitting or the light was shining it looked like somebody in the back seat.

Q. Now referring to an interview that you had with Detec-

tive Nonn, December of 1980, and you do recall that you did go in and have an interview?

A. Yes, sir.

Q. So you did make a statement to Detective Nonn who said Anthony states that at that time that there were three white male subjects in the car, two in the front and one in the back seat?

A. Well, see I didn't say for sure I have—I didn't say for sure if there was or wasn't I said the way it looked from the way I can remember it, it looked like three people in the car.

Q. And did you further tell Detective Nonn that Jim Hill was not one of the people?

A. No, sir.

Q. You don't recall or you didn't tell him that?

A. I don't recall that.

Q. And if Detective Nonn said in his report Anthony could not describe any of the occupants of that car but stated that he knew Jim Hill was not one of the occupants then he is mistaken with regard to what you told him that day?

A. I don't remember telling him that, I mean not that day.

Q. How many doors did the car have?

A. I can't completely remember, I just can't remember.

Q. If I showed this to you would it refresh your memory as to what you said at that time?

A. Yes.

Q. Now, having looked at that, do you remember what you told him on that date?

A. Yes.

Q. What did you tell him on that date?

A. It has been so long ago I just don't remember.

Q. O.k., so you are indicating that your memory would have been better at that time than it is today?

A. Yes.

Q. And if you said it was *a newer looking car with four doors* at that time then that is right?

A. That is right.

Q. Your memory would have been better at that time and more likely true?

A. Yes.

Q. And is, if you said that Jim Hill was definitely not one of the people your memory would have been more likely to be correct at that time in December?

A. I guess so." (Emphasis added.)

And on cross-examination:

"Q. [Prosecutor]: I just asked or I am just asking in your mind and you are testifying of certain matters and you are under oath, are you telling what you honestly feel is the truth, but are you confusing possibly some of the things that you have heard from other people or from your relatives or from anyone else involved or anywhere, are you confusing that with what you actually remember, or can you say or not?

A. Well, maybe I am see, because I can't remember all that, well maybe."

Anthony said Tim told him Jim Hill was coming to pick him up. Anthony said that he had not, however, paid attention to the car that came, or to its occupants, and that he was therefore unable to say whether Hill or defendant had been in the car, even when shown a photograph of defendant as he appeared at that time.

Defendant's wife, Julie Eddington, testified that she was present at defendant's residence when defendant sold Hill a .25-caliber automatic in July or early August 1980. She said they bought another .25-caliber automatic, People's exhibit No. 24, in October or November 1980, and that her husband had owned only one .357, purchased around September 1980 (apparently the time of purchase, as the prosecutor asked whether the gun had not previously been stolen on September 19, 1980)—both acquisitions after the alleged murder date. She said they also owned .16- and .12-gauge guns, a .22, and a .32. After testifying her husband had not owned a .45 gun in 1980, she was confronted with a bill of sale showing defendant had purchased a .45 that year.

The State called Julie Eddington in rebuttal and asked whether she had ever told the police that Hill bought a .25 automatic from defendant. She said they never asked her. The prosecutor asked whether she had been present at the last trial and was aware of what her husband said at trial. She said she could not remember. Defense counsel objected that the questioning unfairly raised the inference that defendant should have testified at this trial, but made no objection to the reference that there had been a prior trial. The court overruled defendant's motion for a mistrial.

Assorted photographs, Clark's T-shirt with 17 holes and multiple machete slashes, the two .25-caliber projectiles found in Clark's chest cavity, defendant's .25-caliber gun, Hill's drug record books, and .357 bullets (provided by police as demonstrative evidence only) were among items sent to the jury for its deliberations. The jury returned a

verdict finding defendant guilty of murder.

Defendant first contends he was not proved guilty beyond a reasonable doubt where the only evidence against him was the extensively impeached testimony of codefendant Hill, which was not significantly corroborated. Our supreme court reviewed the standard applicable to accomplice testimony in *People v. Wilson* (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291, 292:

> "Although Wigmore was not satisfied with it (7 Wigmore, Evidence sec. 2056 (3d ed. 1940; see also Supp. 1975)), the rule that uncorroborated accomplice testimony is a sufficient ground on which the trier may base a conviction has found almost overwhelming favor in Illinois. (See, *e.g., People v. Hermens* (1955), 5 Ill. 2d 277; *People v. Williams* (1960), 19 Ill. 2d 171; and *People v. Pittman* (1973), 55 Ill. 2d 39.) This court has never questioned the wisdom of regarding such testimony with skepticism and suspicion, however. It is fraught with serious weaknesses such as the promise of leniency or immunity and malice toward the accused. *(People v. Gleitsmann* (1935), 361 Ill. 165.) Such testimony should be subject to careful scrutiny, 'acted upon with great caution' *(People v. LaCoco* (1950), 406 Ill. 303, 313), and have the 'absolute conviction of the truth' *(People v. Zaeske* (2d Dist. 1966), 67 Ill. App. 2d 115, 121). It is also true that whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury or the court. *People v. Farnsley* (1973), 53 Ill. 2d 537; *People v. Palmer* (1962), 26 Ill. 2d 464.
>
> Nevertheless, this court has held that where it is 'plainly apparent that the defendant was not proved guilty *** beyond a reasonable doubt' we will set the conviction aside. *People v. Jurek* (1934), 357 Ill. 626, 632. See also *People v. Palmer* (1962), 26 Ill. 2d 464."

This remains the standard for accomplice testimony in Illinois.

Certainly it would not be enough that Hill told Stinley and Bagley the part which he hoped defendant would play in the murder conspiracy. Neither would it suffice that Hill later laid blame for the murderous act on defendant in statements to Stinley, since Hill surely had reason not to implicate himself. It is clear Hill has made numerous false statements about Clark's murder. In this vein, we particularly note three such statements. First, Hill acknowledged that in his post-arrest statement on January 24, 1981, he may have said that defendant offered to pay him to make a telephone call to Clark to set the

stage for the murder. Hill thus interposed defendant's name in place of his own, although no trial testimony suggested defendant's involvement in that aspect of the murder conspiracy. Second, in notes for his attorney, Hill represented that defendant was not present when Clark was murdered:

"Q. [Prosecutor]: Have you ever said that the defendant, Jerry Eddington, was not present at the site of the murder?

A. Once.

Q. And when was that?

A. When I was trying to make a defense for my lawyer to use in my case." (Emphasis added.)

Third, Hill acknowledged that in notes to his attorney he may have said that he mentioned defendant's name early on and continued using it to avoid repercussions.

As reflected by Hill's plea agreement, read into the record in this trial by the State's Attorney, Hill expected to benefit by giving testimony against defendant in accordance with a statement he had previously given authorities. Hill acknowledged on cross-examination that he believed if he did not testify against the defendant in accordance with that statement he would not get his deal for 30 years, rather than the 60 years Hill's lawyer had discussed with him. After defendant's second trial, Hill was sentenced to 30 years, consistent with his plea agreement.

Likewise, Bagley had reason to expect benefit from his testimony against defendant. After the defendant's second trial, Bagley, charged with two counts alleging obstructing justice and concealing a homicidal death and, according to his testimony, with conspiracy to commit murder, entered a guilty plea to the count of obstructing justice. He was sentenced to two years' probation and ordered to pay a $4,000 fine and costs.

Finally, Clark's skull was apparently never recovered and neither his remains nor the site offered positive proof he had in fact been shot with a .357 as Hill described. Neither the date nor time of Clark's death can be fixed except by reference to Hill's testimony. In contrast to Anthony Clark's testimony that the victim was picked up for his "job" at 4:30 p.m., phone records show a call from Hill's residence to defendant's at 5:02 p.m. According to Hill's testimony, defendant then drove from Cahokia to Troy, picked him up, and they proceeded to pick up Clark. Stinley testified he thought Hill and defendant left in Bagley's *maroon* Cordoba—a car which Bagley testified he no longer owned.

Aspects of Hill's testimony were, however, corroborated to some

extent. Telephone records showed calls placed as Hill described on the alleged date of the murder. Stinley corroborated Hill's account of the conversation in the call from Timballo's and clearly recalled that defendant had left the apartment with Hill on the date of that call.

Defendant did not testify at his second trial and no alibi was offered. The evidence suggested he had been involved in the illicit drug sales. This case does not, therefore, present the distinction of comparative backgrounds between defendant, Hill, Stinley and Bagley, which was relevant in reversing the conviction in *People v. Price* (1974), 21 Ill. App. 3d 665, 316 N.E.2d 289, cited by defendant. This court recently upheld a jury's conviction of murder and conspiracy to commit murder against a similar challenge on reasonable-doubt grounds in *People v. White* (1984), 122 Ill. App. 3d 24, 460 N.E.2d 802. Therein the principal evidence against the defendant came from an accomplice whose testimony was fraught with inconsistencies and extensively impeached. In *White*, the myriad weaknesses in the accomplice's testimony were explored before the jury. We note, however, that there was greater corroboration of the defendant's involvement in the crime charged in *White*. The circumstances in evidence included both greater corroboration of witnesses and facts consistent with the fact of robbery, *i.e.*, physical descriptions of the men and car used in the crime as well as recovery of the weapons used and money taken. We conclude that Hill's credibility is likewise a question for the trier of fact. We therefore decline to reverse on the ground of reasonable doubt.

■■ We find the evidence sufficiently close, however, as to require that the jurors' attention be properly focused on the fact that the State's case against defendant rests upon Hill's credibility. In reviewing the record of defendant's trial, we conclude that both the trial court and counsel permitted the admission of impermissible hearsay, and the error was compounded by the opening statement framing the case as well as the closing argument. In view of our concern that the jurors' attention be properly focused on Hill's credibility, on our own motion, we raise the following as plain error. (87 Ill. 2d R. 615.) In a case such as this when the admission of evidence constitutes error induced by the State and, to a large degree, acquiesced in by defense counsel, the latter circumstance does not render the error harmless. In *People v. Roberts* (1979), 75 Ill. 2d 1, 14, 387 N.E.2d 331, 337, our supreme court stated:

> "In discussing exceptions to the waiver rule as it relates to the failure to raise an issue in the trial court, this court stated in *People v. Burson* (1957), 11 Ill. 2d 360, 370, that the rule

'will not operate to deprive an accused of his constitutional rights of due process.' The court also stated that it may, as a *matter* of *grace*, take notice of errors appearing upon the record *which deprived the accused of substantial means of enjoying a fair and impartial trial.* (11 Ill. 2d 360, 370-71.) In *People v. Pickett* (1973), 54 Ill. 2d 280, 283, this court noted that the plain error exception to the waiver rule will also be applied in criminal cases in which the *evidence is closely balanced.*"

See also *People v. Brown* (1972), 7 Ill. App. 3d 748, 289 N.E.2d 452; *People v. Bell* (1965), 61 Ill. App. 2d 224, 209 N.E.2d 366, and cases cited therein. This case is distinguishable from cases such as *People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164, wherein admission of hearsay evidence does not amount to reversible error. In *Robinson,* there was significant and substantial corroborative evidence by other circumstantial facts.

We view the errors in presentation of this case at trial as having so contravened the jurors' focus on Hill's credibility as to require us to reverse the judgment and remand the cause for a new trial. In doing so, we fully recognize that only rarely should the court intervene. We believe it is our responsibility to do so in this case, however, as the evidence is so close and the chance for injustice so great.

We begin with an explication of the rules under which we recognize plain error in this case: the limits of the co-conspirators' exception to the hearsay rule. Under the co-conspirators' exception to the hearsay rule, any act or declaration (1) by a co-conspirator of a party (2) committed in furtherance of the conspiracy and (3) during its pendency is admissible against each and every co-conspirator, provided that (4) a foundation for its reception is laid *by independent proof of the conspiracy.* (*People v. Goodman* (1980), 81 Ill. 2d 278, 408 N.E.2d 215. See generally J.H. Levie, *Hearsay and Conspiracy: A Reexamination of the Co-Conspirators' Exception to the Hearsay Rule,* 52 Mich. L. Rev. 1159 (1954); Comment, 25 U. Chi. L. Rev. 530 (1958).) Much discussion of this area of the law is found in the decisions of the Federal courts, whose rule is basically the same as the common law rule in Illinois. Federal Rule of Evidence 801(d)(2)(E) (28 U.S.C. 801(d)(2)(E) (1976)) provides:

"(d) Statements which are not hearsay. A statement is not hearsay if—

\* \* \*

(2) Admission by party-opponent. The statement is offered against a party and is \* \* \* (E) a statement by a coconspirator of a party during the course and in furtherance of the con-

spiracy."

For annotations, see *Admissibility as Against Conspirator of Extrajudicial Declarations of Co-Conspirator—Supreme Court Cases*, 1 L. Ed. 2d 1780 (1957 and Later Case Service); *Admissibility of Statement by Co-Conspirator Under Rule 801(d)(2)(E) of Federal Rules of Evidence*, 44 A.L.R. Fed. 627 (1979 and 1983 Supp.).

It is preferable to introduce independent evidence of a conspiracy prior to introducing declarations of a co-conspirator. Whether such declarations are in fact admissible must be decided under the factors enunciated in *Dutton v. Evans* (1970), 400 U.S. 74, 89, 27 L. Ed. 2d 213, 227, 91 S. Ct. 210, 219-20. (*People v. Goodman* (1980), 81 Ill. 2d 278, 408 N.E.2d 215.) The reasoning therefor has been stated in *Glasser v. United States of America* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457, wherein the court said that the declaration of one co-conspirator is admissible over the objection of an alleged co-conspirator who was not present when it was made *only if* there is proof *aliunde* of a conspiracy, "[o]therwise hearsay would lift itself by its own boot straps to the level of competent evidence." (315 U.S. 60, 75, 86 L. Ed. 680, 701, 62 S. Ct. 457, 467; see Annot., 46 A.L.R. 3d, 1148, 1149 (1972).) In *United States v. Renda* (2d Cir. 1932), 56 F.2d 601, 602, it was stated:

> "The declarations of one party to a concerted mutual venture are admitted against the rest on the notion that they are acts in its execution. [Citations.] In so far as they are such, they are authorized by all, and are treated as their admissions. However, obviously the declaration cannot prove the authority any more than that of an agent. The party to be implicated must be shown independently to be in fact a party to the venture; else there is no authority to act for him."

See McCormick, *Evidence* sec. 53, at 19 (1972 and 1978 Supp.); Kessler, *The Treatment of Preliminary Issues of Fact in Conspiracy Litigations: Putting the Conspiracy Back into the CoConspirator Rule*, 5 Hofstra L. Rev. 77, 96 (1976); Annot., *Necessity and Sufficiency of Independent Evidence of Conspiracy to Allow Admission of Extrajudicial Statements of Coconspirators*, 46 A.L.R. 3d 1148 (1972, 1983 Supp.); Comment, *Reconstructing the Independent Evidence Requirement of the Coconspirator Hearsay Exception*, 127 U. Pa. L. Rev. 1439 (1979).

■ Declarations that are *merely narrative* as to what has been done or will be done are incompetent, however, and should not be admitted except as against the defendant making them or in whose presence they are made. (*Spies v. People* (1887), 122 Ill. 1, 12 N.E.

865.) The co-conspirators' exception to the hearsay rule does not extend to statements of past facts. (*People v. Goodman* (1980), 81 Ill. 2d 278, 408 N.E.2d 215.) Casual, retrospective comments made about past facts, as opposed to those with the purpose to advance the objective of the conspiracy, are inadmissible. We conclude that Bagley's testimony on Hill's narrative description of Clark's murder, made in September or October 1980, was not admissible against defendant. See *United States v. Phillips* (5th Cir. 1981), 664 F.2d 971, 1026-27, *cert. denied* (1982), 457 U.S. 1136, 73 L. Ed. 2d 1354, 102 S. Ct. 2965.

As to whether the conspiracy terminates with the commission of the underlying criminal objective, *People v. Meagher* (1979), 70 Ill. App. 3d 597, 388 N.E.2d 801, found the better view to be that a conspiracy includes subsequent efforts at concealment, but *only if* those efforts are proximate in time to the commission of the principal crime. When acts or declarations directed toward concealment are distant from the commission of the offense, they are subject to such grave doubts as to their trustworthiness that they should not be admissible under the co-conspirators' exception to the hearsay rule. In *Meagher*, a telephone conversation on the morning following the charged attack was held to be proximate in time to the commission of the underlying offense. Consistent with this view, *United States v. Floyd* (2d Cir. 1977), 555 F.2d 45, 48, *cert. denied* (1977), 434 U.S. 851, 54 L. Ed. 2d 120, 98 S. Ct. 163, stated:

> "The established rule is that once 'the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.' *Grunewald v. United States*, 353 U.S. 391, 401-02, 77 S. Ct. 963, 972, 1 L. Ed. 2d 931 (1957); *accord Wong Sun v. United States*, 371 U.S. 471, 490, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *Lutwak v. United States*, 344 U.S. 604, 618-19, 73 S. Ct. 481, 97 L. Ed. 593 (1953); *Krulewitch v. United States*, 336 U.S. 440, 443-44, 69 S. Ct. 716, 93 L. Ed. 790 (1949). To rule otherwise 'would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators.' *Grunewald, supra,* 353 U.S. at 402, 77 S. Ct. at 972. *Krulewitch, Grunewald* and related cases create a barrier at the end of a conspiracy that we do not think should be breached to permit the inclusion of an event on the other side, no matter how proximate it may be to

the conspiracy in time and place. To include in the conspiracy an event, no matter how proximately related, occurring after the main objectives of a conspiracy have been accomplished would unnecessarily blur the relatively clear line drawn by the Supreme Court's decisions on this subject."

See also *United States v. Smith* (8th Cir. 1975), 520 F.2d 1245. We find the taped conversations of December 1980—more than three months after the offense—between Stinley and Hill are inadmissible against defendant. The fact that the conversations were recorded provides no cure for the questionable reliability of their content.

Neither are these taped conversations admissible under the more general exception to the hearsay rule referred to in *People v. Strubberg* (1978), 61 Ill. App. 3d 521, 378 N.E.2d 191, and *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738. The requisite link between Stinley and defendant is missing, *i.e.*, there was no evidence that defendant requested Stinley's assistance in the murder or otherwise, by word or act, directly implicated himself before Stinley. Nor is there a connecting link between Stinley and defendant independent of the conspiracy, as was the case in *People v. Hoffmann* (1970), 124 Ill. App. 2d 192, 260 N.E.2d 351.

■ Likewise, statements made by an alleged co-conspirator upon confession or after arrest are not admissible against a defendant unless made in his presence and assented to by him. (*People v. Tunstall* (1959), 17 Ill. 2d 160, 161 N.E.2d 300; *People v. Brown* (1972), 7 Ill. App. 3d 748, 289 N.E.2d 452; *People v. Simpson* (1976), 39 Ill. App. 3d 318, 349 N.E.2d 441. See generally Klein, *Conspiracy—The Prosecutor's Darling*, 24 Brooklyn L. Rev. 1 (1957); Annot., *Admissibility of Statements of Coconspirators Made After Termination of Conspiracy and Outside Accused's Presence*, 4 A.L.R.3d 671 (1965 and 1983 Supp.).) On questioning by police, defendant denied participating in Clark's murder. No man can confess to a crime for anyone but himself. (*People v. Rupert* (1925), 316 Ill. 38, 146 N.E. 456.) Therefore, evidence that co-conspirators implicated defendant in confessions or post-arrest statements is not admissible against the defendant, whether presented through the testimony of co-conspirators, the officers who took their statements, or the statements or confessions themselves. (See *Lutwak v. United States of America* (1953), 344 U.S. 604, 617-18, 97 L. Ed. 593, 603-04, 73 S. Ct. 481, 489-90.) In *Mosley v. United States* (5th Cir. 1960), 285 F.2d 226, the court held that the admission of testimony by a police officer as to the content of post-arrest statements made by alleged co-conspirators was reversible error in the absence of evidence that the conspiracy continued thereaf-

ter. Accord, *Brown* (codefendant's pretrial statements admissible only as to declarant; statements which implicate others, made outside their presence and not assented to by them, are not admissible against others through testimony of police officers who took statements).

The rationale for the rules is amply illustrated by examination of the record in this case. In the opening statement, the prosecutor told the jury how and when Stinley, Bagley, and Hill implicated defendant. In the State's case in chief, officers testified that Stinley, Bagley, and Hill implicated defendant in post-conspiracy statements, confessions, and post-arrest statements. Stinley, Bagley, and Hill testified that they implicated defendant in post-conspiracy statements, confessions, and post-arrest statements. In closing argument, the prosecutor reviewed for the jury the panorama of witnesses who testified that defendant had been implicated consistently by Stinley, Bagley, and Hill. The implications, *in toto*, may seem to transform their testimony into substantive evidence. However, they do not. Nor are they corroborative of defendant's guilt.

■ Inasmuch as officers such as Nonn and Rushing testified herein as to the post-conspiracy statements of co-conspirators, those portions of such statements as implicated the defendant are not within an exception to the hearsay rule and are not admissible. To the extent that such testimony implicates the defendant, it attempts to bolster that evidence which is Hill's alone through the comments of authorities. There is no bias as to these witnesses. Hence, although the sole source of such evidence is Hill, it appears to the jury as if many are saying it, thereby creating a picture of substantive evidence against the defendant such as to constitute reversible error.

*Tunstall* held such post-conspiracy statements could not be used to impeach the declarant testifying in defendant's behalf. (See also *People v. Childress* (1953), 1 Ill. 2d 431, 115 N.E.2d 794.) Fundamental fairness will not countenance accomplishment by indirection of that which it will not permit directly. We note, however, that those portions of such statements as do not implicate the defendant may be available to impeach the declarants.

In light of our disposition of this case, we decline to comment on other errors which were neither objected to at trial nor raised on appeal; but we will consider other errors raised by defendant, so they need not be repeated on retrial.

■ Defendant's second argument is that the State improperly focused the jury's attention on his failure to testify by bringing out that he had testified at his first trial. The prosecutor called Mrs. Eddington in rebuttal and asked whether she was aware of what defend-

ant had said during the last trial. Defense counsel's motion for a mistrial was denied. It appears that the prosecutor sought to show that neither the witness nor defendant had previously told authorities that defendant sold Hill a .25-caliber gun in the summer of 1980. Defendant contends that any comment on the accused's failure to testify, or remarks by the State which call attention thereto, constitute error (*People v. Holman* (1974), 19 Ill. App. 3d 544, 311 N.E.2d 696), and that by bringing out the fact that he had testified in an earlier trial, the State's Attorney drew the jury's attention to the fact that he failed to testify before them (*People v. Burton* (1978), 63 Ill. App. 3d 915, 380 N.E.2d 929). We do not believe that error resulted here. At the time when this testimony came in, the defense had rested its case. Generally, there would be no occasion for a defendant to testify after he has rested his case. At the time these references were made, during rebuttal, the absence of defendant's testimony was apparent, and it could reasonably be said that the jury would know he had not testified. Only if the references complained of had been elicited during cross-examination, when Mrs. Eddington was a witness of defendant and before defendant rested, could it be argued that he was prejudiced since, under that circumstance, he would have to choose to testify or face possible prejudice in the eyes of the jury.

Defendant next argues that improper remarks by the prosecutor in closing argument denied him a fair trial. The remarks involved (1) comment upon defendant's failure to call certain witnesses; misstating the evidence by (2) stating that defendant lied to officers following his arrest, (3) saying that Hill never said defendant was not involved in Clark's murder, and (4) suggesting defendant responded after Bagley said he returned to "the body"; and (5) comment on the definition of reasonable doubt. The State contends that defendant has waived any allegation of error as to all but the first above-referenced remark. The other remarks were not raised in defendant's post-trial motion. Of the last four, only the second of them was objected to at trial, and that by specific objection, *i.e.*, suppression of the taped phone conversation between Hill and defendant, thereby waiving the error raised here. At our discretion, we decline to apply the waiver doctrine to the alleged errors herein. The waiver rule is a device for the convenience of the court and is not to be followed where the case is close or where prejudice is involved. *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331.

As to the first of these, defendant argues that the prosecutor improperly commented in closing argument on defendant's failure to call as alibi witnesses Tom Smith, Don Hurt, and Kevin Case, since

the only evidence that these persons could offer alibi testimony was elicited by the State from its own witness, Detective Leonard Surrey. The prosecutor stated:

> "Ask yourselves again what evidence is probative and should be considered very heavily and you can decide one way or the other. Remember the defendant's statement. He says he is with Bagley and Hill and they run into three more people, they run into Tom Smith, Don Hurt, and Kevin Case. If they ran into three people, where are they to take the stand and tell you that?
>
> [Defense counsel]: Your Honor, I object to that.
>
> THE COURT: Overruled.
>
> [Prosecutor]: They would be in here telling you that if in fact he had been with Bob Bagley and Jim Hill and that happened. It didn't happen."

As a general rule, it is improper for the prosecution to comment on a defendant's failure to present witnesses when such witnesses are equally accessible to both parties. (*People v. Popely* (1976), 36 Ill. App. 3d 828, 345 N.E.2d 125.) An exception to the rule exists where potential alibi witnesses are interjected into the case by the defendant but are not produced at trial. (*People v. Gray* (1964), 52 Ill. App. 2d 177, 201 N.E.2d 756, *rev'd on other grounds* (1965), 33 Ill. 2d 160, 210 N.E.2d 486; *People v. Swift* (1925), 319 Ill. 359, 150 N.E. 263; *People v. Anthony* (1976), 41 Ill. App. 3d 1025, 355 N.E.2d 218.) This exception does not apply when the existence of potential witnesses is elicited from a defense witness on cross-examination. (*People v. Mays* (1972), 3 Ill. App. 3d 512, 277 N.E.2d 547.) We hold the exception likewise inapplicable when the existence of potential witnesses is interjected into the case through the State's witnesses.

The State concedes that the prosecutor's reference to the defendant's failure to call these witnesses was probably erroneous, but argues the remark could not have resulted in substantial prejudice to defendant since the jury was instructed on the purposes of argument and the burden of proof. We disagree. If error of this nature were deemed so easily cured, the prosecution could violate the rule and argue harmless error in any case. We hold the remark constituted reversible error.

As to the second of these, defendant contends that in closing argument the prosecutor misstated the evidence concerning his conversation with police officers following his arrest, calling him a liar with no evidence in the record to support the accusation. The prosecutor said:

"What does the defendant do when he is arrested? The first thing is he doesn't know the victim, Tim Clark. \*\*\* They ask him if he has had any conversations with Jim Hill on the 24th of January, 1981. The defendant wants to cooperate, right. What's the first thing he does? *He lies to the police about talking to Jim Hill. He lies* because then the police say, no, we are aware that you talked with him. Then he admits talking to Hill.

[Defense counsel]: Your honor I would object to this at this time. May I approach the bench?

Your Honor, my objection is the same objection that we had the time before when this was raised. [Objection related to taping of phone conversation between Hill and defendant which tape was suppressed.]

THE COURT: Overruled. You may proceed.

[Prosecutor]: *The defendant lies* to the police the very first time the agent talks with him." (Emphasis added.)

We find no testimony that the defendant denied having spoken to Hill on January 24, 1981. We conclude that the prosecutor did misstate the evidence by suggesting that defendant lied to police about whether he had spoken to Hill. It appears from the record that the prosecutor believed he would adduce such testimony, but it was not forthcoming. Assumptions in statements of fact not based upon evidence in the case may not properly be argued to the jury, and may be deemed prejudicial to the accused. (See *People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280 (defendant's objections to argument overruled), and cases cited therein; *People v. Johnson* (1976), 35 Ill. App. 3d 666, 341 N.E.2d 443; see also *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880 (prosecutor's repeated questions in closing argument, over objection, that defendant lied, among other closing argument remarks, was condemned as grossly improper—not inadvertent errors—and severely prejudicial, led to reversal of judgment, as court was unable to say remarks did not contribute to defendant's conviction); *People v. Broadnax* (1975), 26 Ill. App. 3d 67, 325 N.E.2d 23 (characterization by prosecutor in closing arguments calling defendant "liar" several times, not objected to at trial, condemned by reviewing court which held, however, such conduct does not constitute reversible error where proof of guilt is supported by substantial evidence).) This misstatement ought not be repeated on retrial.

As to the third of these, defendant argues the prosecutor misstated the evidence by commenting as follows:

"So Hill testified, and again, I have already reiterated that all he has done is accept more responsibility. *[Hill] has never*

*ever said* before he was under investigation, before his arrest, at his arrest, after his arrest, he never ever said *that [defendant] was not involved.*" (Emphasis added.)

We note the following exchange between the prosecutor and Hill on redirect examination:

"*Q. [Prosecutor] Have you ever said that the defendant, Jerry Eddington, was not present at the site of the murder?*

*A. Once.*

Q. And when was that?

A. When I was trying to make a defense for my lawyer to use in my case.

Q. The only person you told that to or wrote that down for was your own lawyer?

A. That's correct.

Q. Did you ever tell the police officers?

A. No, sir.

Q. You've stated first you weren't involved, then you said that [defendant] was involved on the 24th, leaving yourself out of the murder?

A. Of the murder, yes.

Q. You never ever said he was not there?

A. That's correct." (Emphasis added.)

It is evident from this passage that the prosecutor sought to draw a distinction between Hill's damaging admission of his written statement to his attorney and what he otherwise *said.* We think this distinction amounted to a misstatement of the evidence. (*People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280; *People v. Johnson* (1976), 35 Ill. App. 3d 666, 341 N.E.2d 443.) Direct contradiction of an accomplice's testimony, as well as material corroboration, is entitled to considerable weight. (*People v. Hermens* (1955), 5 Ill. 2d 277, 125 N.E.2d 500.) We trust that this misstatement will not be repeated on retrial.

■■■ As to the fourth of these, defendant claims the prosecutor misstated Bagley's testimony commenting on his venture to Clark's remains with Hill in December and defendant's response:

"Then Bagley comes up and says something about moving the body. The defendant doesn't say anything. Maybe it is an inopportune time. We didn't hear the circumstances. In any event, Bagley the second time says, 'We took care of everything, *the body has been taken care of.*' What does this man say? 'I hope so.' Are those the words of an innocent man? Definitely not. And there was no misunderstanding about what they were talking about. It doesn't happen twice." (Emphasis added.)

Defendant maintains it was unclear from the evidence whether he knew what Bagley was talking about, whereas the prosecutor's remarks suggest the evidence showed defendant knew what Bagley was referring to. The State references the following testimony on Bagley's second approach to defendant as supporting the prosecutor's reference:

"Q. [Prosecutor]: Then back in the interview on January 26th, isn't it true that you said, 'A couple of days later I ran into Mick Eddington. I told him what happened and Mick said, you know, I hope everything is taken care of,' and you said, 'I thought we took care of everything,' and Mick said, 'Yeah, I hope you did, too.' Is that the second conversation?

A. [Bagley] Yes, sir."

We find that the prosecutor's inclusion of the phrase "the body has been taken care of" did not correctly quote Bagley's testimony. To a certain extent, the prosecutor's representation *changes the meaning* of the referenced conversation, *making it more specific than the testimony had been.* To exemplify this change of meaning, consider an instance of testimony that a witness saw X carrying a large bundle to throw into the ditch, and its presentation in argument that the witness had seen X carrying a body to throw in the ditch. With regard to this alleged error, we need comment only that such a change in the meaning of a conversation as between the testimony and its representation in closing argument presents a misstatement of evidence which, in a close case, can be error.

■■ As to the last of these, defendant also urges that the prosecutor improperly defined reasonable doubt to the jury in the following remarks:

"A reasonable doubt means just that. It doesn't mean beyond all doubt. As long as you may have some doubt as to what exactly occurred, that doesn't mean the defendant is not guilty. That presumption of innocence vanishes as soon as you take your jury votes and the defendant is convicted. That's a presumption, nothing more. Don't let reasonable doubt stop you. That's a doubt based upon reason."

The law in Illinois is clear that the concept of reasonable doubt needs no definition. (*People v. Cagle* (1969), 41 Ill. 2d 528, 244 N.E.2d 200.) It is improper for either the court or counsel to attempt to define reasonable doubt to the jury. (*People v. Gray* (1979), 80 Ill. App. 3d 213, 399 N.E.2d 206; *People v. Amos* (1977), 46 Ill. App. 3d 899, 361 N.E.2d 861; see also *People v. Hope* (1974), 22 Ill. App. 3d 721, 318 N.E.2d 128; *People v. Martinez* (1979), 76 Ill. App. 3d 280, 395

N.E.2d 86.) In this case, the prosecutor's strident remarks went beyond those referred to as inappropriate in *Amos* and improper in *Gray*, but not deemed reversible error in either case. Such remarks tend to de-emphasize the State's burden. (*People v. Johnson* (1981), 102 Ill. App. 3d 122, 429 N.E.2d 905.) A review of defense counsel's argument to the jury discloses no reference which suffices to provoke or justify this argument of the State's Attorney. We trust the prosecutor will not address the definition of reasonable doubt on retrial.

In view of our disposition of this appeal, we need not consider defendant's fourth contention of error on appeal, that pertaining to the disparity between the length of his sentence and that imposed on co-defendant Hill.

Reversed, and cause remanded for a new trial consistent with the views expressed herein.

GREEN, J., concurs.

JUSTICE MILLER, concurring in part and dissenting in part:

I agree with the majority that the defendant's guilt for the offense of murder was proved beyond a reasonable doubt, and I agree that the State's participation in the post-trial proceedings in the trial court operated to revest the court with jurisdiction. I disagree, however, with the holding that the prosecutor's error in remarking, in his closing argument, on the absence of alibi witnesses warrants granting the defendant a new trial. Also, for the reasons mentioned below, I would not decide the question whether various statements of the defendant's co-conspirators constituted inadmissible hearsay. Accordingly, I dissent from the decision to grant the defendant a new trial.

It should be noted at the outset that the question of co-conspirator hearsay testimony has not been raised by appellate counsel. Furthermore, the defendant, represented by different counsel at trial, did not object to the introduction of this evidence and did not include the issue in his post-trial motion. Thus, the question has been waived at every stage of the proceedings here. In raising the question *sua sponte* and deciding it without the benefit of briefing by the parties, the majority mounts what I consider to be an unjustified intrusion into the normal adversarial process and distorts the plain-error exception to the waiver rule. The majority's action in my view is unwarranted, given the circumstances in this case.

I recognize, of course, that the waiver rule "is a rule of administration and not of jurisdiction or power, and it will not operate to de-

prive an accused of his constitutional rights of due process'' (*People v. Burson* (1957), 11 Ill. 2d 360, 370, 143 N.E.2d 239, 245). Plain errors are properly noticed when the evidence of guilt is close or, separately, when necessary to preserve the essential integrity of the judicial process. (*People v. Sanders* (1983), 99 Ill. 2d 262, 457 N.E.2d 1241. See *Silber v. United States* (1962), 370 U.S. 717, 8 L. Ed. 2d 798, 82 S. Ct. 1287 (*per curiam*); *United States of America v. Atkinson* (1936), 297 U.S. 157, 80 L. Ed. 555, 56 S. Ct. 391. *Cf. Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation* (1971), 402 U.S. 313, 28 L. Ed. 2d 788, 91 S. Ct. 1434 (parties instructed to brief and argue questions that had not been raised in petition for *certiorari*).) I do not believe that the introduction into evidence of the arguably inadmissible evidence deprived the defendant of due process, or vitiated the integrity of the proceedings. Nor do I believe that the evidence of guilt was closely balanced and that the alleged error might have significantly affected the jury's verdict; here, the admissible testimony of the defendant's accomplice was sufficient to sustain the conviction (*cf. People v. Newell* (1984), 103 Ill. 2d 465, 469 N.E.2d 1375 (accomplice testimony is not proof beyond a reasonable doubt when it is uncorroborated and is contradicted by the testimony of other accomplices)). Because the hearsay question concerning the co-conspirators' testimony was not raised, I would not decide that question or the question whether its use requires a new trial.

The other basis for the majority's decision to grant the defendant a new trial is the comment made by the prosecutor, in his closing argument, on the defendant's failure to have certain alibi witnesses testify. The issue was properly preserved, it is raised here by appellate counsel, and the State concedes that the remark was error. I agree that the remark was improper, for the witnesses were not more available to the defendant than they were to the State, and the State rather than the defendant had injected their names into the case. See *People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247; *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.

I do not believe, however, that the error requires that the defendant be granted a new trial. The jury was properly instructed on the limited purpose of closing argument. Given the evidence of the defendant's guilt, reasonable grounds do not exist for believing that the remark prejudiced the jury's deliberations and affected its verdict, and therefore the error should be deemed harmless. See *People v. Whitlow* (1982), 89 Ill. 2d 322, 433 N.E.2d 629 (expressing standard of review).

The defendant raises four additional objections to the prosecutor's

closing argument—whether he misstated the evidence on three occasions, and whether he acted improperly in defining "reasonable doubt." The majority finds these to be erroneous or possibly erroneous. Unlike the comment concerning alibi testimony, however, objections to these remarks were not properly preserved in the trial court. I would find that they were not "so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process" and that therefore they should be considered waived (*People v. Owens* (1984), 102 Ill. 2d 88, 104, 464 N.E.2d 261, 268). I agree with the majority's conclusion that the examination of Mrs. Eddington in rebuttal did not constitute an improper comment on the defendant's failure to testify. The one remaining issue raised by the defendant concerns his sentence; the majority does not reach this question, given its decision to award the defendant a new trial, and I need not comment on it.